### GIBBS & COX, Inc., v. COMMISSIONER OF INTERNAL REVENUE.
### No. 81.

Circuit Court of Appeals, Second Circuit.

Jan. 29, 1945.

---

Thomas G. Chamberlain, Hugh Satterlee, Edward J. Willi, and I. Herman Sher, all of New York City (John M. Maguire, of Boston, Mass., of counsel), for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, A. F. Prescott, and Carlton Fox, Sp. Assts. to Atty. Gen., for respondent.

Before SWAN, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

SWAN, Circuit Judge.

Section 102 of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 102,[1] imposes a surtax upon the net income of a corporation if the corporation is availed of for the purpose of preventing the imposition of surtaxes upon its shareholders through the medium of permitting its earnings or profits to accumulate instead of being distributed, and provides further that the fact that the corporate earnings or profits are permitted to accumulate beyond the reasonable needs of the business

shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary. In the case at bar, after a very detailed and complete review of the financial history of the petitioner's business from its inception, the Tax Court found that during each of the years 1938, 1939 and 1940 the earnings or profits of the petitioner were permitted to accumulate beyond the reasonable needs of its business and the petitioner was availed of in those years for the purpose of preventing the imposition of surtaxes upon its stockholders. These findings resulted in an order redetermining deficiencies in the income taxes of the petitioner, from which it has appealed.

Judge Arundell's memorandum decision made very detailed findings of fact. It is unnecessary to recite them all. There is no substantial dispute as to the primary facts; the dispute relates to the inferences to be drawn from them. William Francis Gibbs and Frederic H. Gibbs are eminent naval architects and marine engineers who have followed their profession for many years. In 1929 they, together with a yacht designer, Daniel H. Cox, organized the petitioner, Gibbs & Cox, Inc., to carry on the business of naval architecture, marine engineering and the designing of all kinds of ships. Each of the three individuals contributed $10,000 to the capital of the corporation and received in return one-third of its stock, but during 1938 the stock of Mr. Cox was purchased by the corporation for $40,000 and retired. Since then the corporation's capital stock has been $20,000, owned equally by the Gibbs brothers. From 1929 to 1933 petitioner was engaged in designing yachts and merchant ships; it had a small staff of employees at 1 Broadway and did little business, its net income not exceeding $2,000 in any of the years through 1933. In the latter year the Navy awarded contracts for destroyers to three shipbuilding companies and, at the Navy's request, petitioner was given supervision over the designing of such vessels. It supervised a large staff of the United Design Department of United Dry Docks, comprising from two hundred to three hundred employees. Petitioner had no responsibility for the payment of wages or other expenses of the United

---

[1] Section 102 of the Revenue Act of 1938, applicable to that taxable year, is substantially identical with section 102 of the Code which governs the years 1939 and 1940.

Design Department. This arrangement with the shipbuilding companies expired on November 20, 1935. But there still remained work to be done on the uncompleted destroyers and the other destroyers on which the shipbuilding companies had received orders, and they desired the petitioner to substitute itself for the United Design Department, which would mean that it would assume responsibility for the payment of more than three hundred employees. Petitioner replied that it was incapable of financing any such operation as the United Design Department. It was then arranged at the instance of Federal Shipbuilding Corporation and Bath Iron Works that·if the petitioner would assume responsibility for the payroll and other costs incurred by substituting itself for the United Design Department, Federal would promptly remit to the petitioner amounts equal to its expenditures for the payroll, rent and other operating costs; and Bath was to contribute sums to Federal to assist in this purpose. Accordingly the petitioner employed on its own account a design staff comparable to the United Design Department and rented space at 21 West Street to which the staff was removed. Pursuant to the agreement with Federal that company would remit to the petitioner within a few days after payment by it the amounts of payrolls, rents and other costs with respect to the operations at 21 West Street. Before December 1935 the largest number of employees petitioner had ever had was 45. Following the creation of its design organization in substitution for the United Design Department petitioner had 364 employees in December 1935. Thereafter at the end of the respective years the numbers were as follows: In 1936, 443; in 1937, 487; in 1938, 486; 1939, 582; 1940, 799; 1941, 1318; 1942, 2356. Practically all of these employees were hired on a weekly salary basis. The payroll for salaries and wages jumped from $145,000 in 1935 to $1,222,000 in 1938; $1,872,800 in 1940 and $3,354,600 in 1941. Its staff is by far the largest individual engineering organization in the world.

In addition to the naval work which started in 1933 and continuously increased the petitioner was employed in 1939 to design and procure the materials for a group of British merchant ships, and this was followed late in 1940 by a contract with the Maritime Commission to design the first 312 Liberty ships. The expansion of petitioner's business is reflected in the following table:[2]

| | Gross income | Total expenses before Fed. taxes | Net income per books |
|---|---|---|---|
| 1936 | $1,296,900 | $1,261,500 | $ 5,228 |
| 1937 | 1,538,600 | 1,504,700 | 22,881 |
| 1938 | 1,947,400 | 1,715,800 | 221,882 |
| 1939 | 2,119,000 | 1,823,500 | 232,638 |
| 1940 | 2,722,200 | 2,465,400 | 190,223 |
| 1941 | 5,292,400 | 4,486,900 | 571,911 |

Gross income for 1942 was a little in excess of $10,000,000 and total expenses before federal taxes were approximately $8,300,000. At the time of the trial before the Tax Court in January 1943 petitioner had in its office about 40 projects representing approximately 70% of all the shipbuilding in this country. Whenever the Navy has a difficult job of ship designing to be done, as tank-landing craft, it is given to the petitioner. For several years both shipbuilding companies and the government have come to depend upon petitioner for designs.

Petitioner has at all times conserved its resources in the form of cash and has never invested in securities of any kind; nor has it ever paid a dividend. It has not paid excessive salaries to its officers. The cash on hand at the end of 1937 was $473,106.56 and at the end of each of the taxable years was $575,597.68 in 1938, $833,976.95 in 1939, $990,012.58 in 1940. At the end of 1941 the cash had increased to $1,677,967.41. At the beginning of the taxable years the capital and surplus (after deductions for accrued income taxes) was $343,101 in 1938, $415,253 in 1939 and $644,116 in 1940. At the beginning of 1941 it was $835,393. Thus the increase in surplus from the beginning of 1938 to the end of 1940 was more than $492,000.[3]

The petitioner contends that the Tax Court erred in finding that profits were accumulated beyond the reasonable needs of the taxable years. It argues that it was entitled to accumulate working capital in order (a) to become independent of the financing supplied by Federal and as-

---

[2] The figures in the first two columns are given in round numbers.

[3] As stated in the taxpayer's balance sheets the amount of capital and surplus in each of the taxable years is larger than the figures given above which reflect deductions on account of the current year's federal taxes.

sociated shipbuilding companies and (b) to provide reserves against the possible cessation of such financing, the risk of possible liability arising from negligence of its designing staff, and the expense of future transition from war conditions to peace conditions. The Tax Court, however, was of opinion that the petitioner's need for working capital was very small, as compared with its volume of business, due to the advantageous financing by Federal and associated shipbuilding companies. Notwithstanding the large expansion in its business, the petitioner appears never to have been out of pocket for operating expenses in excess of $200,000, according to the testimony of Mr. Frederic H. Gibbs, and in this amount for only a few days at a time. Judge Arundell thought that the capital and surplus at the beginning of 1938 were ample to cover such amount, and he noted that the bank balances remained substantially constant from month to month, except as they were increased as a result of the accumulated earnings. He said that the petitioner had "contracted in effect to sell services for cash payment," that there was no factual basis for fearing that the shipbuilders would withdraw their financial aid, and that the suggestion of a reserve to meet possible damage suits finds no support in the record, no reserve for such a contingency ever having been set up by the petitioner and no such claim for damages ever having been asserted against it. He rejected the testimony of two experts called by the petitioner because their opinions were based upon working capital needs in the absence of the financing arrangement with Federal.

The scope of judicial review in a case of this character is extremely limited. Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 1086; Trico Products Corp. v. Commissioner, 2 Cir., 137 F.2d 424, 426, certiorari denied 320 U.S. 799, 64 S.Ct. 369; W. H. Gunlocke Chair Co. v. Commissioner, 2 Cir., 1944, 145 F.2d 791. The inferences which the Tax Court has drawn from the undisputed primary facts cannot be upset, unless arbitrary, merely because in the exercise of an independent judgment we might draw different inferences as to the reasonable needs of the petitioner's business. Judge Arundell's conclusion that earnings were accumulated beyond the reasonable needs of the business is not so arbitrary an inference nor so unsupported by substantial evidence that we should be justified in setting it aside.

If that finding stands, the statute declares it to be "determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary." The stockholders categorically denied that such was the purpose, but such denials are not necessarily controlling. Helvering v. Nat. Grocery Co., 304 U.S. 282, 295, 58 S.Ct. 932, 82 L.Ed. 1346; Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 701, 63 S.Ct. 843, 87 L. Ed. 1086. The stockholders knew that distributions would have increased their surtaxes. The Tax Court said that as between such knowledge on the one hand and what it considered a patently inadequate reason for a large reserve of cash on the other hand, "we are firmly convinced that the surtaxes to be saved played a part, and a very important part, in the determination to refrain from making distributions." Under the authorities already cited a finding that the corporation was availed of for the interdicted purpose is conclusive, if supported by substantial evidence. We cannot say that it is not so supported and must therefore affirm the orders appealed from. It is so ordered.