*Decision will be entered under Rule 50.*

BELAIRE MANAGEMENT CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 38987. Promulgated March 15, 1954.

*E. Gayle McGuigan, Esq.*, and *Richard Kilcullen, Esq.*, for the petitioner.

*S. Jarvin Levison, Esq.*, for the respondent.

## OPINION.

MURDOCK, *Judge:* Section 102(a) provides for the imposition of a surtax upon a corporation if it was availed of during the taxable year for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting its earnings or profits to accumulate instead of being divided. Section 102 (c) provides:

EVIDENCE DETERMINATIVE OF PURPOSE.—The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary.

The petitioner contends that its earnings and profits for the taxable year, the first year of its existence, were reasonably needed to carry on the business after the close of that year. The Commissioner concedes that some part of the earnings might have been reasonably needed in the business but argues that the total accumulations at the end of the year were substantially beyond the reasonable needs of the business. His imposition of the surtax must stand unless the petitioner has shown "by the clear preponderance of the evidence" that there was in the retention of those earnings no purpose to avoid surtax upon the shareholders. The answer depends upon the facts established by the evidence.

The petitioner argues that there were a number of conditions existing at the end of the taxable year which made its future uncertain and

in one way or another justified it in retaining the earnings of its first year of operation. It summed these up pretty well in requesting a finding of fact that:

In the opinion of the directors [when they considered the question of paying dividends prior to the end of the taxable year] the scale of the company's operations, requiring expenditures of around $60,000 a month at the 1948 level, the large amount of uncancellable obligations, the work to be done to establish the Harwood brand in the market, to offset the prejudicial effects of the O. P. A. and A. T. U. investigation and of the jeopardy assessments and to meet the necessary competition from older brands, and the prospective change of importers, reasonably required retention of all of the corporation's first year's earnings as working capital.

It seems apparent at the outset that any unfavorable factors resulting from the O. P. A. and A. T. U. investigations together with the jeopardy assessments had been overcome by the end of the taxable year. They, along with other of the factors mentioned, were in existence when the petitioner started in business, yet, its business was quite successful during the first year of operations even without all of its capital of $25,000.

The petitioner would need more operating funds as its expenditures on behalf of its sole client increased. That was because of the delay of almost a month in receiving reimbursement from its client for expenditures. The petitioner at the end of the calendar year 1948 proposed to Duncan Harwood that expenditures of approximately $1,250,000 be planned for the calendar year 1949 with the expectation that about 200,000 cases could be sold in the United States during the year. It also asked Duncan Harwood to increase the "imprest" fund from $75,000 to $100,000. Duncan Harwood refused the request to increase the "imprest" fund but it asked the Foreign Exchange Control Board (called F. E. C. B.) to approve the $1,250,000 program. F. E. C. B. said it would adhere to its quarterly commitments but indicated a favorable attitude towards the increased expenditure plan. However, it was apparent by March 31, 1949, the end of the taxable year, that the program of increased expenditures had been called off and that a much more modest one was in effect.

The petitioner, prior to the end of the taxable year, had reason to believe that the company which previously had been importing Harwoods into the United States was going to discontinue that business and that efforts were being made to obtain a new importer. The petitioner felt that sales would decline during an interval of several months or more while the transition from one importer to another was being made and it argues that there was something in that situation which justified it in retaining its earnings of the taxable year. That argument would be convincing only if the petitioner were planning to make larger expenditures on behalf of Duncan Harwood to overcome the ill

effects of the transition. But no such plan has been shown. The evidence shows that sales fell off, as anticipated, but it also shows that the expenditures of the petitioner on behalf of Duncan Harwood declined during its second taxable year.

The Canadian Government enacted the Foreign Exchange Control Act on August 31, 1946, and F. E. C. B. was established thereunder. Duncan Harwood had to make applications to that Board in order to send funds from Canada to the petitioner in the United States. F. E. C. B. granted permits for not more than 3 months at a time and Duncan Harwood would make application at the end of each 3 months for permission to pay estimated amounts for the succeeding 3 months. F. E. C. B. could refuse a permit or cancel one already granted but it never refused a permit or canceled one once granted to Duncan Harwood at any time material to this case. F. E. C. B. presented no serious obstacle in the transmission of funds to the petitioner. The situation was not changing from what it had been during the successful tax year. The petitioner's argument that its need for operating funds was greater because of the existence of F. E. C. B. is not convincing.

There was no reason to believe towards the close of the taxable year that Duncan Harwood would be unable to reimburse the petitioner during its next fiscal year for all expenditures for which it was to be reimbursed by Duncan Harwood under its contract with that client, including any reimbursement which would become necessary by reason of cancellation of advertising contracted for or by reason of cancellation of any other commitments made by the petitioner on behalf of Duncan Harwood. Furthermore, the petitioner never had any reason to believe that Duncan Harwood would refuse or would delay unduly in reimbursing it in accordance with their contract.

The petitioner claims and the Commissioner concedes that the petitioner needed in the operation of its business enough funds to carry on its business for approximately 1 month because it took the better part of a month for Duncan Harwood to reimburse the petitioner. The petitioner points out that its billings to Duncan Harwood were about $63,000 for March 1949. It claims that it needed, in addition to the $63,000, funds to cover uncancelable obligations of at least $112,000, and to meet these obligations of about $175,000 it had only the fund of $75,000 received from Duncan Harwood, capital of $25,000 and the earnings of the taxable year in the amount of $71,151.44 as it faced the future at the end of the taxable year. The evidence fails to support the petitioner's contention that it needed funds to cover uncancelable obligations in the amount of $112,000 or that it needed half of any such amount. This situation was another which had existed during the profitable tax year.

The petitioner's witness best qualified on the subject of its advertising contracts testified that the uncancelable commitments on March 31, 1949, would have amounted to $41,016.72. It is not entirely clear what he meant by that but he said that the figures "are based not on how much would be billed to the client had cancellation taken place as of that date, but merely what the books showed could be cancelled." He also said that "You can figure at least 50 per cent again of each of these months" but again his statement and reason are not entirely clear. Taking this testimony in its most favorable light for the petitioner it would mean that the petitioner could not avoid expenditures on behalf of its client of about $62,000 if it canceled all of the commitments which it had made on behalf of the client. Some cancellations were normal but obviously complete cancellations would be made only in case the whole arrangement were called off unexpectedly and even then the petitioner would undoubtedly be promptly reimbursed by Duncan Harwood. Furthermore, it does not appear that the whole would fall due immediately or that a delay in payment until it had actually received the money from Duncan Harwood might not be justified in such an emergency. This possible terminal need would not justify keeping $112,000 ready at all times during the life of the petitioner. This argument, if sound as to $62,000, would mean that the petitioner would need approximately $125,000 ($63,000 plus $62,000) of operating funds and certainly much less than the $170,000 which it had available at the end of the taxable year. The fact that Klein, the one with the greatest interest in the petitioner, did not pay for his stock during the taxable year or the following year indicates that the petitioner was not in real need of funds.

The petitioner has made no point of the fact that it did not invest any surplus funds in nonbusiness assets (cf. *Jacob. Sincoff, Inc.*, 20 T. C. 288, affd. 209 F. 2d 569) but that fact, every other fact favorable to the petitioner, and all of the arguments made by the petitioner have been carefully considered. The record justifies the finding that the earnings or profits of the petitioner for the taxable year were permitted to accumulate beyond the reasonable needs of the business and the next question is whether it has proven "by the clear preponderance of the evidence" that those excess earnings were not permitted to accumulate for the purpose of preventing the imposition of the surtax upon its stockholders. The person primarily responsible for the creation and operation of the petitioner was H. H. Klein. He owed the petitioner $5,750 on his stock subscription until February 1951. Rosenberg also owed the petitioner $1,000 on his stock subscription until that time. Thus, these 2 stockholders had use of money which belonged to the petitioner and which the petitioner is contending it needed. The interest rate on the notes was 2 per cent.

The petitioner was in the position of lending money to its stockholders to the extent of $6,750. This tends to support the Commissioner's determination. Two of the directors testified categorically that no thought was given to surtaxes on the stockholders when a decision was reached not to pay any dividend during the taxable year. Their testimony is entitled to some weight, although not corroborated, but not controlling weight. *Gibbs & Cox, Inc.* v. *Commissioner*, 147 F. 2d 60. The parties have stipulated that the stockholders would have had substantial surtaxes to pay if dividends had been declared. The record taken as a whole does not show a clear preponderance in favor of the contention of the taxpayer that there was no purpose to avoid surtaxes on the stockholders, as required by section 102 (c).

*Decision will be entered for the respondent.*