PELTON STEEL CASTING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 50455.   Filed April 25, 1957.

154

*Malcolm K. Whyte, Esq., John L. Palmer, Esq.,* and *Richard L. Greene, Esq.,* for the petitioner.

*David H. Nelson, Esq.,* for the respondent.

FISHER, *Judge:* The instant proceedings involve the following deficiencies in surtaxes under section 102 of the 1939 Code determined by the respondent for the taxable years ended November 30, 1945 and 1946, respectively:

| Year | Amount |
|------|--------|
| 1945 | $12,214.22 |
| 1946 | 69,746.66 |

Respondent, on brief, conceded no deficiency for 1945.

The petition herein was filed on September 8, 1953, in response to a notice of deficiency[1] mailed to petitioner on August 24, 1953. The cause was heard on December 1 and 2, 1955. Section 534 of the Internal Revenue Code of 1954 was amended by Act of August 11, 1955, ch. 805, secs. 4 and 5, 84th Cong., 1st Sess., 69 Stat. 689, so as to apply retroactively to pending proceedings tried after the date of

---

[1] The notice of deficiency, insofar as is here material, was based upon the following determination:

The surtax under Section 102 (a) of the Internal Revenue Code is being imposed * * * inasmuch as it has been determined that you were availed of for the purpose of preventing the imposition of surtax upon your shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed.

enactment of such amendment.[2]    Thereafter, on September 7, 1955, a notification [3] was mailed to the petitioner in the proper manner, and on October 6, 1955, petitioner timely submitted its statement [4] to respondent.

---

[2] Sections 4 and 5 of the Act of August 11, 1955, provided as follows:

SEC. 4. Subsection (e) of section 534 of the Internal Revenue Code of 1954 (relating to burden of proof in certain proceedings relating to imposition of accumulated earnings tax) is hereby amended to read as follows:

(e) APPLICATION OF SECTION.—

(1) Notwithstanding any other provision of law, this section shall apply with respect to taxable years to which this subchapter applies and (except as provided in paragraph (2)) to taxable years to which the corresponding provisions of prior revenue laws apply.

(2) In the case of a notice of deficiency for a taxable year to which this subchapter does not apply, this section shall apply only in the case of proceedings tried on the merits after the date of the enactment of this paragraph.

SEC. 5. Subsection (b) of section 534 of such Code (relating to notification by Secretary) is hereby amended by adding at the end thereof the following new sentence: "In the case of a notice of deficiency to which subsection (e) (2) applies and which is mailed on or before the 30th day after the date of the enactment of this sentence, the notification referred to in the preceding sentence may be mailed at any time on or before such 30th day."

[3] The material portions of said notice stated:

In accordance with the provisions of section 534 of the Internal Revenue Code of 1954, as amended * * * you are hereby notified that the statutory notice of deficiency * * * issued on August 24, 1953, sets forth an amount with respect to section 102 of the Internal Revenue Code of 1939, relating to surtax upon corporations improperly accumulating surplus (or, section 531 of the Internal Revenue Code of 1954, relating to the accumulated earnings tax).

Within thirty days after the mailing of this notification, you may submit a statement of the grounds (together with facts sufficient to show the basis thereof) on which you rely to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business.

[4] Petitioner's "Statement of Grounds Under Section 534, As Amended" stated, *inter alia:*

1. During and prior to the taxable years, it was the consistent policy of Pelton Steel Casting Co. to distribute to its shareholders, as dividends, a substantial portion of its earnings and profits. * * *

2. During the taxable years and prior thereto, it was the practice of the Company, and it was required to and did, retain a reasonable amount of earnings to maintain a working bank balance for the operation of its business (including the payment of wages and salaries, payroll taxes, trade accounts, supplies, utilities, and other current obligations) and to pay its current income taxes. * * * The Company required a working bank balance for its regular day to day operations of not less than about one month's sales, * * * during the taxable period. * * *

3. The cash position of the Company during the taxable period was low in relation to the needs of the business, particularly in light of its sales and current liabilities. * * *

[Table of cash, current liabilities, ratio of cash to current liabilities.]

The reasonableness of the foregoing amounts of cash in the operation of the business, particularly in relation to the current liabilities, is demonstrated by the data of comparable companies set forth, *infra,* in paragraph 5. Moreover, with respect to the taxable year ended November 30, 1946, a substantial portion of the cash on hand at that date was required for and subsequently used for the purchase and liquidation of the stock of certain officers, as hereinafter described.

4. The current assets and the working capital of the Company were low during the taxable years in relation to the requirements of the business, particularly in the light of its current liabilities, sales and the hazardous nature of the business and in relation to data of the industry and members of the industry. * * *

The Company was also faced during the taxable period with a serious problem of lack of modern machinery and equipment, as a result of which, some of its major operations were obsolete, inefficient and wasteful of labor. * * * The Company had long-range plans to modernize and install new machinery and equipment, but these plans were interrupted temporarily by the more pressing business needs referred to

The issues for decision are (1) whether, within the meaning of section 102 of the Internal Revenue Code of 1939, petitioner was availed of during the taxable year ended November 30, 1946, for the purpose of avoiding the imposition of surtax upon its shareholders by permitting earnings and profits to be accumulated instead of dividing or distributing them, and (2) the extent, significance, and application to the instant case of changes in the burden of proof under the provisions of section 534 of the Internal Revenue Code of 1954.

### FINDINGS OF FACT.

All of the stipulated facts are incorporated herein by this reference.

Pelton Steel Casting Company, the petitioner, is a Wisconsin corporation and filed its tax returns for the periods in question on a fiscal year basis ending on November 30 with the then collector of internal revenue for the district of Wisconsin.

Petitioner was organized and incorporated on December 14, 1925, as the outgrowth of the liquidation of a local division of a larger company which had proved unprofitable. The original charter provided

---

hereinafter in paragraph 6; but they were, however, consummated in subsequent years * * *

For detailed facts with respect to our obsolete equipment, we refer to the statement (and exhibits attached thereto) filed in our behalf with the Internal Revenue Agent in Charge, dated October 5, 1949, relating to our lack of modern equipment, which facts and data are incorporated herein by reference.

[Table of company's current assets, current liabilities, working capital at the beginning and close of the taxable years, net sales, ratios of current assets to the current liabilities, and working capital to sales.]

The foregoing amounts of current assets, working capital and sales and ratios thereof demonstrate that there was no unreasonable accumulations beyond the needs of the business, especially when viewed in light of similar data and ratios of the industry and of comparable companies, as hereinafter reflected in paragraph 5.

5. The earnings and profits of the Company were not accumulated beyond the reasonable needs of the business as demonstrated by similar financial data and ratios of the taxpayer's industry and of comparable companies in the industry, as reflected, *inter alia,* in the following table:

[Table of industry, comparable companies in Wisconsin and elsewhere, and listed companies (industry and non-Wisconsin company data, where available, per Dun & Bradstreet; comparable Wisconsin company data per Wisconsin separate tax returns for years in question; listed company data per Standard & Poor's Listed Stock Reports).]

6. The Company retained a substantial amount of its earnings and cash during the taxable year ended November 30, 1946, in order to purchase and liquidate the stock of its principal stockholder and president, Arthur J. Ehne. Ehne intended and attempted in 1946 to sell his stock or the corporate assets to outside interests, and was joined in that purpose by another stockholder, Thomas L. Fawick. In order to preserve and protect and assure the continuance of the successful operating policies of the business, its separate identity, its major customer accounts, the close and cordial relations of the management and employees, the continuity of harmonious and able management, including the continued participation of A. M. Slichter, one of the founders and principal officers and now president of the Company (which constituted his life work), the company purchased and liquidated the stock of Ehne and Fawick, using the proceeds of a $500,000 loan and $300,000 of its cash preserved for that purpose.

In order to finance the purchase of the stock by the Company so as to prevent the business from falling into the hands of outsiders, it was imperative for the Company to preserve its funds, and the required corporate loan of $500,000 would have been impossible if its earnings had been distributed. * * *

for 500 shares of $100-par-value capital stock. Its founders contributed the following amounts of capital with which they bought the inventory, plant, and equipment of the liquidated Pelton Steel Division of the Stowell Company:

| | |
|---|---:|
| A. J. Ehne | $30,000 |
| Allen Slichter | 5,000 |
| H. A. Leekley | 5,000 |
| Total original capital | $40,000 |

The articles of incorporation were amended on June 20, 1928, increasing the authorized capital to 2,000 shares of $100-par-value capital stock.

Ehne, at the time of incorporation, was a middle-aged man with a good deal of financial experience, who owned a pattern shop which made and sold patterns to foundries and was otherwise active in the steel casting business. Leekley had been employed for some time in the steel casting production department of petitioner's predecessor. Slichter was a younger man and had been employed for a period of about 5 years prior to petitioner's organization in the sales department of its predecessor company—after several months in that company's storeroom and production departments. Ehne was made petitioner's president and treasurer with general supervision and over-all control of its operations. Leekley was made vice president, in charge of production. Slichter became petitioner's secretary and had charge of its sales.

Except for a short period in the late 1920's when Ambrose Peters temporarily acquired a small interest in petitioner, there was no substantial change in its ownership until 1943 when Leekley sold out to Thomas L. Fawick, of Cleveland, Ohio. Fawick did not take any active part in petitioner's operations except to attend board meetings and to be available for consultation. Slichter assumed Leekley's responsibilities as regarded employee relations and works management. During the taxable period, petitioner's outstanding stock was held as follows:

| Name | Shares held |
|---|---:|
| Arthur J. Ehne | 898 |
| Allen M. Slichter | 300 |
| Thomas L. Fawick | 300 |
| Lillian A. Brandt | 1 |
| Malcolm K. Whyte | 1 |
| | 1,500 |

The directors and officers of the company during the taxable period were:

Arthur J. Ehne_____ Director_____ President and treasurer
Thomas L. Fawick_____ Director_____ Vice president
Malcolm K. Whyte_____ Director_____ Vice president
Allen M. Slichter_____ Director_____ Secretary
Lillian A. Brandt_____ Director_____ Assistant secretary

Petitioner produces steel castings by means of a process in which scrap steel melted at extremely high temperatures in electric furnaces is poured into molds formed of sand. In conjunction therewith, petitioner operates a pattern shop for its own purposes and for outside jobs.

A long range comparison of steel casting production with that of steel production as a whole in this country, would show the former to be subject to severe cyclical fluctuations with too much to do in emergency periods and normally not enough in between. Steel casting, in general, can also be classified as a hazardous industry in view of the nature of the operation (pouring hot metal into fragile formed molds in sand); the volatile price of its principal raw material (scrap steel, being a marginal material, can fluctuate widely in price upon relatively slight variances in supply or demand); and the dependency of the industry's market (its product not being an end product) upon the markets of its respective customers. Viewing the steel casting industry as a whole, the railroad industry is generally the largest single customer for steel castings (taking up to 35 per cent of production). Tool and machinery manufacturers comprise another large market, taking nearly 25 per cent of production. Rolling mills also consume a large part of production. Four per cent of total production is scrapped and 1 per cent of sales is normally returned from customers as defective. The collection period for accounts receivable, upwards of 30 days, is slightly longer than other industries. The industry is highly competitive within itself (having a number of relatively small companies) and outwardly with the manufacturers of other materials such as welded fabrications and forgings.

Petitioner's operation has been successful. Construction, papermaking, and agricultural heavy equipment manufacturers, and makers of machine tools, are its principal customers. The electric steel castings produced are not standard products nor are they themselves end products; but, rather, are custom made (from petitioner's or the customer's patterns) for, and become a part of, various kinds of durable equipment produced by the aforementioned independent manufacturers. Petitioner's gradual progress (with the exception of the 1931–1933 depression years) is indicated by the following schedule:

|  | 1926 | 1935 | 1940 | 1941 | 1942 |
|---|---|---|---|---|---|
| Net sales (per books) | $337, 000 | $508, 000 | $552, 000 | $946, 000 | $1, 500, 000 |
| Net profit before taxes (per books) | 23, 000 | 31, 000 | 97, 000 | 173, 000 | 250, 000 |
| Net profit after taxes (per books) | 18, 000 | 24, 000 | 75, 000 | 105, 000 | 94, 000 |

During all these years of its operation (with the exception of the depression and post-depression years 1931 through 1934), petitioner regularly declared and paid dividends to its shareholders in substantial amounts. The amounts and times of the dividend declarations varied, but, with the exception of a single declaration and payment in 1939, there were usually from 2 to 4 declarations and payments during the course of each year. A total of some $308,000, or an average of about 50 per cent of net profits after taxes, was paid during the 1926–1942 period.

In and around 1941, petitioner had erected a small addition of modern steel and concrete construction which increased its foundry by 8,280 square feet. To meet the needs of the war emergency (World War II), petitioner applied for and was granted the following certificates of necessity, on September 10, 1941 (and thereafter amended as indicated), to improve and expand its facilities:

PELTON STEEL CASTING CO.

ITEMIZED LIST OF INDIVIDUAL EMERGENCY FACILITIES COVERED BY CERTIFICATE OF NECESSITY WDN–3174

| | Amount per original certificate Sept. 10, 1941 | Amount per revised certificate Mar. 20, 1942 | Added by Feb. 16, 1944, amendment | Amount per amended certificate | Amount subject to amortization |
|---|---|---|---|---|---|
| Buildings: | | | | | |
| 1-story addition to east end of foundry building | $19,850 | $24,462.95 | ------------ | $24,462.95 | $24,462.95 |
| Equipment: | | | | | |
| Ingersoll-Rand air end | $6,350 | $8,866.99 | ------------ | $8,866.99 | $8,684.94 |
| Molding machines: | | | | | |
| Type PJS | 2,910 | 1,940.00 | ------------ | 1,940.00 | |
| Type F 31 x 16 | 5,380 | 5,380.00 | ------------ | 5,380.00 | 9,001.62 |
| Installation | ------------ | 1,681.18 | ------------ | 1,681.18 | |
| Rammers: | | | | | |
| No. 40 AR Thor | 540 | 540.00 | ------------ | 540.00 | 540.00 |
| No. 50 RR Thor | 380 | 380.00 | ------------ | 380.00 | 380.00 |
| Substation: | | | | | |
| 1500 KVA furnace transformer | 10,600 | 13,648.82 | ------------ | 13,648.82 | |
| 450 KVA power transformer | 3,276 | 4,219.88 | ------------ | 4,219.88 | 23,827.89 |
| Enlargement | ------------ | 4,640.14 | $1,319.05 | 5,959.19 | |
| Capacitators 100 KVA | 1,920 | 1,736.56 | ------------ | 1,736.56 | 1,736.56 |
| Wheel type 24" roller conveyor | 1,250 | ------------ | ------------ | ------------ | ------------ |
| Crane OH-2016-B | 275 | ------------ | ------------ | ------------ | ------------ |
| Monorail complete | 5,400 | ------------ | ------------ | ------------ | ------------ |
| Roller conveyor system | ------------ | 5,367.13 | ------------ | 5,367.13 | 5,367.13 |
| Hand crane and hoist | ------------ | 1,308.91 | ------------ | 1,308.91 | 1,308.91 |
| Archbeam crane runway complete | ------------ | 3,490.50 | 3.00 | 3,493.50 | 3,493.50 |
| | $38,281 | $53,200.11 | $1,322.05 | $54,522.16 | $54,340.55 |
| Total | $58,131 | $77,663.06 | $1,322.05 | $78,985.11 | $78,803.50 |

PELTON STEEL CASTING CO.

ITEMIZED LIST OF INDIVIDUAL EMERGENCY FACILITIES COVERED BY CERTIFICATE OF NECESSITY WDN–12701

| | Amount per original certificate | Added by Feb. 16, 1944, amendment | Added by Dec. 8, 1945, amendment | Amount per amended certificate | Amount subject to amortization |
|---|---|---|---|---|---|
| **Buildings and other construction:** | | | | | |
| Unit A | }$214,397.58 | $59,399.48 | $22,276.91 | $296,073.97 | $296,073.97 |
| Units B, C, and D | | | | | |
| Railroad sidetrack and retaining wall | 10,843.13 | | | 10,843.13 | 9,004.08 |
| Gas Generator house | 1,168.00 | | | 1,168.00 | 1,168.00 |
| Total | $226,408.71 | $59,399.48 | $22,276.91 | $308,085.10 | $306,246.05 |
| **Equipment—pattern shop:** | | | | | |
| Yates American surfacer | $1,619.80 | $15.55 | | $1,635.35 | $1,635.35 |
| **Equipment—power generating and distributing:** | | | | | |
| Fairbanks-Morse motor generator | $4,186.46 | $3,574.95 | $589.80 | $8,351.21 | $8,351.21 |
| **Equipment—other:** | | | | | |
| Pittsburgh furnace | $35,642.00 | $21,643.87 | | $57,285.87 | $57,285.87 |
| Lindberg furnace | 7,239.25 | 1,010.36 | | 8,249.61 | 8,249.61 |
| Simpson mixer | 1,368.00 | | | 1,368.00 | 1,368.00 |
| Abrasive cutoff machine | 1,143.45 | 11.55 | | 1,155.00 | 1,155.00 |
| Wheelabrator and loader | 11,400.00 | | | 11,400.00 | 11,039.18 |
| Dust collecting system | 5,142.75 | 41.88 | | 5,184.63 | 5,184.63 |
| Crane with 45″ magnet (2) | 30,357.50 | | 391.40 | 30,748.90 | 30,748.90 |
| Core ovens | 9,779.00 | 537.66 | 1,546.00 | 11,862.66 | 11,862.66 |
| Core racks (8) | 1,140.80 | | | 1,140.80 | 1,140.80 |
| Swing grinders (2) | 2,520.00 | 34.97 | | 2,554.97 | 2,554.97 |
| Stand grinder | 2,000.00 | 24.10 | | 2,024.10 | 2,024.10 |
| Facing mill with loader, etc | 10,533.00 | | | 10,533.00 | 10,195.32 |
| Rod straightener | 1,350.00 | | | 1,350.00 | 1,350.00 |
| Welding machine (2) | 1,070.00 | | | 1,070.00 | 1,070.00 |
| Air ends complete | 3,054.80 | 68.97 | | 3,123.77 | 3,123.77 |
| Wehr shop tractor | 795.00 | | | 795.00 | |
| Fairbanks dial scale | 1,082.00 | | | 1,082.00 | 1,082.00 |
| Finish grinder | 1,437.00 | | | 1,437.00 | 1,404.92 |
| Cope and drag molding machine | 2,020.00 | 23.44 | | 2,043.44 | 2,043.44 |
| Type B molding machine | 520.00 | | | 520.00 | |
| Clamshell bucket | 1,265.00 | | | 1,265.00 | 1,265.00 |
| Annealing oven—car type | 9,000.00 | 864.94 | | 9,864.94 | 9,864.94 |
| Sandhandling and conveying unit | 7,000.00 | 3,646.06 | | 10,646.06 | 10,646.06 |
| Frame K hoists (3) | 628.00 | 54.90 | | 682.90 | 682.90 |
| 2 ladles and stand | 1,634.00 | | | 1,634.00 | |
| Tramrail bridges (UTW2540D)—1 unit of 2 | 6,100.72 | | | | |
| Tramrail bridges (UTW2534D)—1 unit of 2 | 4,285.72 | | | | |
| Tramrail bridges (UCW2540D)—1 unit of 2 | 3,851.62 | | $1,295.86 | $30,839.00 | $30,839.00 |
| Tramrail bridges (THE224E)—1 unit of 1 | 1,556.08 | | | | |
| Shakeout complete | 13,749.00 | | | | |
| 4-ton charging buckets (2) | 395.00 | | | 395.00 | |
| 1-ton casting skip buckets (4) | 380.00 | | | 380.00 | 380.00 |
| Total | $179,439.69 | $27,962.70 | $3,233.26 | $210.635.65 | $206,561.07 |
| Grand total | $411,654.66 | $90,952.68 | $26,099.97 | $528,707.31 | $522,793.68 |

The amounts of substantially all of the foregoing items (totaling nearly $602,000) were subject to amortization. Petitioner deducted amortization for the fiscal years 1942 to 1945 in the following amounts:

| | |
|---|---|
| 1942 | $14,213.40 |
| 1943 | 71,914.83 |
| 1944 | 116,555.16 |
| 1945 | 212,989.10 |

Thereafter, on November 13, 1945, as the result of a Presidential proclamation ending the emergency period as of September 30, 1945, petitioner elected to terminate the amortization period upon all the

items covered under the certificates of necessity as of September 30, 1945, and claimed adjusted amortization for the fiscal years 1942 to 1944 in the following total amounts:

1942_____ $19, 922. 73
1943_____ 132, 385. 45
1944_____ 236, 399. 70

By virtue of the foregoing improvements and additions, petitioner had replaced its old plant and equipment with new, modern buildings and equipment—greatly increasing its floor area to 110,000 square feet and its productive capacity from some 200,000 to 800,000 tons a month. It also increased the efficiency of its operation. The only further significant addition which appears to have been anticipated at that time was another shakeout (sand-handling equipment which shakes sand out of flasks after they have been poured and cooled), the estimated cost of which—together with the tunnel, elevator, and bins required therefor—approximated $100,000.

The following schedule reflects the additions and improvements petitioner made to its plant between 1946 and 1954:

| Year | Amount (thousands of dollars) | Year | Amount (thousands of dollars) |
|---|---|---|---|
| 1946 | $8. 15 | 1951 | $122. 27 |
| 1947 | 50. 31 | 1952 | 32. 15 |
| 1948 | 44. 16 | 1953 | 92. 01 |
| 1949 | 11. 56 | 1954 | 121. 41 |
| 1950 | 38. 20 | | |

The following schedule reflects, by departments, the nature and amount of the most significant additions and improvements made during the period from 1946 to 1954, inclusive, and the total amounts expended for all additions and improvements throughout said period in each department:

| Department | Year | Description | Amount (thousands of dollars) | Total 1946 through 1954 expenditure (thousands of dollars) |
|---|---|---|---|---|
| Pouring and shakeout | 1947 | Shakeout and crusher unit_____ | $33. 8 | $207 |
| | 1948 | Sand storage system for shakeout_____ | 26. 2 | |
| | 1951 | Completed new sand storage system (begun in 1950). | 32. 9 | |
| | 1953 | Begun, overhead sand distribution system (finished, 1954). | 64. 2 | |
| Core room | 1954 | New core ovens_____ | $75. 5 | $93 |
| Cleaning room | 1951 | 60' x 96' wheelobrator and refuse pit_____ | $63. 2 | $91 |
| Melt department | 1947 | 10-ton overhead crane_____ | $9. 7 | $23 |
| | 1951 | 4-ton bull ladle; spray nozzles in dust collector, hydroscales. | 4. 25 | |
| Inspection and heat treat | 1946 | Heat-treating furnaces, water quench tank; making pit. | $5. 98 | $20 |
| | 1953 | Annealer, also gas safety devices and surface plate therefor. | 4. 06 | |
| | 1953 | 75-ton capacity hydraulic straightening press. | 4. 08 | |
| Molding | 1948 | Roller conveyors in molding machine___ | $4. 47 | $19 |
| | 1948 | No 195 jolt, squeeze pinlift molding unit_ | 8. 4 | |

The aggregate expenditures for the standards and maintenance departments, the pattern shop, the laboratories, and for small tools, for the whole 9-year period, ranged between $2,000 and $6,000. The most significant acquisitions occurred in 1951 in the pattern shop; in 1950 and 1951 in small tools; in 1953 and 1954 in maintenance; in 1948 and 1950 in standards; and in 1954 in the laboratories. Of the $50,000 of general expenditures, the most significant appropriations were in 1952 and 1954 when $15,000 and $13,000 were spent on locker rooms, showers, and plumbing, and on fire pump, station wagon, and air line, respectively.

Petitioner had the following amounts of gross sales and net profits after taxes in its fiscal years ended November 30, 1947 and 1948:

| Year | Sales | Net profits after taxes |
|------|-------|-------------------------|
| 1947 | $2,144,000 | $198,096 |
| 1948 | 2,326,000 | 164,794 |

To help finance the aforementioned World War II improvement and expansion program, petitioner, on or about July 20, 1943, borrowed the sum of $200,000 from the Reconstruction Finance Corporation under a promissory note of that date, due in installments on or before 3 years. Under the terms of the loan agreement executed in conjunction with said note, petitioner could not declare or pay any dividends without the prior consent of the R. F. C. Petitioner was also required to make additional payments of principal based on its net earnings for each prior fiscal year, such payments being due on or before 2 months after the close of the fiscal year. Petitioner had requested and secured extensions of time to July 20, 1946, for the payment of such additional amounts of principal for the fiscal years 1943 and 1944 upon its claim and the R. F. C.'s determination that petitioner's working capital at that time was limited. For the same reason, the R. F. C. denied Ehne's request of October 31, 1944, that the R. F. C. waive its requirement that an existing standby agreement executed by him applicable to $45,000 owed to him by petitioner be extended to July 20, 1946. Petitioner met its regular monthly installment payments of principal and interest, under the terms of the note, beginning on October 20, 1943, through the payment on October 18, 1945. On October 27, 1945, petitioner, in one lump-sum payment, discharged the remaining balance of its obligation under the note ($62,612.09, plus interest of $47.45).

Cyclical fluctuations such as described, relating to the steel casting industry in general, occurred during the mid-1940's. A large part of the business in the industry was based upon contracts for the direct manufacture of war materials. The level of activity dropped off

toward the end of 1944 with the curtailing of military programs, and dropped even more sharply, with a great number of holdups and cancellations, in and around August 1945, when hostilities ceased. In the year 1946, there were predictions of unemployment in the industry. At the same time, the unions were demanding wage increases. As a result of the 18½-cent an hour increase accorded steelworkers (on strike since January of that year), steel casting companies also had to contend with demands for wage increases so as to continue to compete in that labor market. Prices continued to be controlled by the O. P. A. until October, and the industry had to fight off the demands. Steel scrap prices were decontrolled at the same time as other prices and had increased by 44 per cent at the close of the year. Also, during 1946, there were strikes in the plants of the principal steel casting customers in the electrical field. Two coal strikes affected other customers, and the railroad workers also went on strike. The net result in 1946 (after the removal of O. P. A. price controls, but due to the competitiveness arising from the aforementioned wage-price "squeeze" and the decline of business) was that the average level of steel casting prices dropped 5 per cent from that of 1945. The general attitude in the industry in 1946 was that the outlook was poor insofar as planning was concerned. The interest was mainly in stabilizing conditions so as to be able to continue operations.

Petitioner's own experience (for the combined operations of its foundry and pattern shop) during fiscal years 1945 and 1946 was as follows:

(1) Petitioner has always enjoyed excellent relations with its employees. There was no labor union organization in its plant. There was neither unrest nor strikes among its workers, actual or threatened, in 1945 or 1946. The average hourly earnings of its foundry workers ($1.24 in 1945; $1.40 in 1946, excluding shift differentials) exceeded the rate generally in effect throughout the steel casting industry by some 10 to 12 cents in 1945 and 29 to 30 cents in 1946. Where the average rate in the industry had declined slightly in 1946, petitioner's had risen some 16 cents an hour. These same relative wage differentials continued throughout the post-taxable period and up to the time of the hearing of this cause. In addition to the foregoing hourly wage rates, petitioner's employees were also recipients of a program of "fringe benefits" (e. g., paid holidays, birthday gifts, vacations, profit-sharing, and unemployment and accident insurance) that aggregated some 17½ cents an hour in 1945 and 22½ cents an hour in 1946, which also increased steadily in subsequent years. Amounts in excess of $117,000 of such benefits were paid in 1945 and $112,000 in 1946.

(2) The cost of the basic raw materials (principally structural scrap or low phosphate steel and other ancillary materials such as silica sand, refractories, bentonite, ferromanganese, and silica flour) for 1944 through 1946 comprised about 10 per cent of the cost of sales. The combined cost of direct and indirect labor represented between 50 per cent and 55 per cent of the total cost of sales. Petitioner's principal competitors were about 5 to 7 other electric steel foundries in the general area.

(3) Petitioner's experience with regard to the aging and ultimate collectibility of its accounts receivable was very good and better than that of the industry as a whole. No bad debts were written off during the 1945 fiscal year and a $5,041 reserve was deemed adequate to cover all losses that might be sustained in collecting the accounts ($99,-516.16) outstanding as of November 30, 1945 (74.7 per cent of which had been billed that November). On November 30, 1946, $117,750.71 of accounts receivable were outstanding, 81.8 per cent of which had been billed that November, and a $10,000 reserve for bad debts was deemed adequate.

(4) Petitioner's profits for its fiscal years 1942 through 1945 were subject to renegotiation. The $15,000 adjustment determined for 1942 was paid to the Government. A claim for a renegotiation rebate in the amount of $5,709.33 for that year, based upon an additional amortization deduction, was filed. The net result of this claim has not been determined. Proceedings for 1943 and 1944 have been concluded and petitioner was found to have made no excessive profits. For fiscal 1945, representatives of the Chicago Ordnance District made a preliminary review and recommended a finding that no excessive profits were derived from sales subject to renegotiation, which was apparently accepted; and petitioner's name was stricken from the Government's renegotiation list.

(5) Petitioner's earnings and profits for each of these operating periods, and its status at the close of each, respectively, are summarized in schedules A and B—

Schedule A.

|  | 1945 | 1946 |
|---|---|---|
| Net sales | $2,000,000 | $1,970,000 |
| Gross profit on sales | [1] 236,000 | [2] 455,000 |
| Profit before taxes | 117,000 | 337,000 |
| Net profit | 46,000 | [3] 170,000 |

[1] After a deduction by petitioner of some $213,000 representing the amount of accelerated amortization allowed on the emergency facilities erected pursuant to certificates of necessity, mentioned in the findings, *supra*, and elected to be taken as of that period.

[2] After a normal amortization deduction of some $37,000.

[3] Excess profits taxes applied only to the first month (December 1945) of this fiscal year.

SCHEDULE B.

|  | 1945 | 1946 |
|---|---|---|
| Total current assets | [1] $508,000 | [2] $814,000 |
| Total current liabilities | [3] 208,000 | [4] 201,000 |
| Fixed liabilities | ------- | ------- |
| Earned surplus | 255,000 | [5] 921,000 |

[1] Of this amount $206,000 was represented by cash in banks and on hand; $100,000 in trade accounts receivable.

[2] Of this amount $590,000 was represented by cash in banks and on hand; $118,000 in trade accounts receivable.

[3] Included herein (in addition to other accrued liabilities such as Federal and State taxes) is the accrued contribution ($53,000) payable to the employees' profit-sharing and retirement plan, payment of which is to be regularly made, pursuant to amendment to the plan by petitioner's board of directors on November 19, 1945, 60 days after the close of each fiscal year.

[4] Included herein are the accrued contributions payable to the employees' profit-sharing and retirement plan ($46,000) ; and accrued Federal income taxes for fiscal 1946 in the amount of $146,188.23. Total taxes accrued (including some $21,000 of Wisconsin State income tax) were $182,560.42.

[5] As of December 1, 1945, the reserves for amortization for emergency facilities, the cost of which had been amortized over a period beginning the month following the month of acquisition to September 30, 1945, were restated to reflect book values based on normal rates of depreciation with a resultant adjustment transferring to surplus the round amount of $497,000 (which, in addition to the approximately $170,000 of net profit for the period after taxes, accounts for the $666,000 increase).

On November 30, 1943, petitioner had had, in round amounts, $266,000 in current assets (of which $37,000 was in cash; $116,000 in net accounts receivable). Its current liabilities then totaled $295,000. Its only long-term obligation was its indebtedness to the R. F. C., in the amount of $191,000. Earned surplus at that time amounted to $168,000. By November 30, 1944, petitioner's current assets totaled $421,000—with cash of $178,000, and net accounts receivable of $150,000. Total current liabilities were $370,000. The notes payable to the R. F. C. had been reduced to $125,000. Petitioner's earned surplus then stood at $239,000.

The following schedule reflects the ratio of working capital to sales of petitioner and 5 Wisconsin steel casting companies for 1945 and 1946, upon the basis of data contained in the respective Wisconsin income tax returns or auditor's reports:

| Company | 1945 | | | 1946 | | |
|---|---|---|---|---|---|---|
|  | Working capital | Net sales | Ratio of working capital to net sales (per cent) | Working capital | Net sales | Ratio of working capital to net sales (per cent) |
| Sivyer Steel Casting Co | $1,544,366 | $4,885,392 | 31.61 | $1,595,768 | $3,766,063 | 42.37 |
| Crucible Steel Casting Co | 495,493 | 3,089,579 | 16.03 | 726,376 | 2,726,152 | 26.64 |
| Wehr Steel Co | 1,085,137 | 3,350,042 | 32.39 | 1,320,989 | 3,059,749 | 43.17 |
| Maynard Elec. Steel Casting Co | 830,918 | 3,169,340 | 26.22 | 906,207 | 3,283,964 | 27.60 |
| Belle City Malleable Iron Co | 958,953 | 7,239,730 | 13.25 | 1,168,584 | 5,211,973 | 22.42 |
| Pelton Steel Casting Co | 306,426 | 1,998,212 | 15.33 | 512,819 | 1,960,832 | 26.15 |

The following schedule reflects the ratio of current assets to current liabilities of the petitioner and the same 5 Wisconsin steel casting companies for 1945 and 1946, upon the basis of the same data sources as above:

| Company | 1945 | | | 1946 | | |
|---|---|---|---|---|---|---|
| | Current assets | Current liabilities | Ratio of current assets to current liabilities | Current assets | Current liabilities | Ratio of current assets to current liabilities |
| Sivyer Steel Casting Co | $2, 104, 253 | $559, 887 | 3. 76:1 | $1, 905, 756 | $309, 988 | 6. 15:1 |
| Crucible Steel Casting Co | 1, 006, 425 | 510, 932 | 1. 97:1 | 1, 259, 010 | 532, 634 | 2. 36:1 |
| Wehr Steel Co | 1, 505, 781 | 420, 644 | 3. 58:1 | 1, 723, 593 | 402, 604 | 4. 28:1 |
| Maynard Elec. Steel Casting Co | 1, 191, 618 | 360, 700 | 3. 30:1 | 1, 372, 798 | 466, 591 | 2. 94:1 |
| Belle City Malleable Casting Co | 2, 055, 279 | 1, 096, 326 | 1. 87:1 | 1, 612, 504 | 443, 920 | 3. 63:1 |
| Pelton Steel Casting Co | 514, 319 | 207, 893 | 2. 47:1 | 814, 033 | 301, 214 | 2. 70:1 |

The following schedule reflects the ratio of cash items to current liabilities of petitioner and the same 5 Wisconsin steel casting companies for 1945 and 1946, upon the basis of the same data sources as above:

| Company | 1945 | | | 1946 | | |
|---|---|---|---|---|---|---|
| | Cash items | Current liabilities | Ratio of cash items to current liabilities | Cash items | Current liabilities | Ratio of cash items to current liabilities |
| Sivyer Steel Casting Co | $1, 259, 444 | $559, 887 | 2. 25:1 | $1, 265, 375 | $309, 988 | 4. 08:1 |
| Crucible Steel Casting Co | 344, 509 | 510, 932 | . 67:1 | 655, 286 | 532, 634 | 1. 23:1 |
| Wehr Steel Co | 746, 921 | 420, 644 | 1. 78:1 | 1, 174, 282 | 402, 604 | 2. 92:1 |
| Maynard Elec. Steel Casting Co | 723, 719 | 360, 700 | 2. 01:1 | 949, 403 | 466, 591 | 2. 03:1 |
| Belle City Malleable Iron Co | 943, 593 | 1, 096, 326 | . 86:1 | 411, 765 | 443, 920 | . 93:1 |
| Pelton Steel Casting Co | 205, 860 | 207, 893 | . 99:1 | 590, 050 | 301, 214 | 1. 96:1 |

The following schedules reflect the ratio of working capital to sales of petitioner and 7 companies selected by petitioner's expert witness and listed in Standard & Poor's Listed Stock Reports or Moody's Manual of Investments:

| Company | 1945 | | | 1946 | | |
|---|---|---|---|---|---|---|
| | Working capital | Sales | Ratio of working capital to sales (per cent) | Working capital | Sales | Ratio of working capital to sales (per cent) |
| American Brake Shoe Co | $23, 400, 000 | $77, 240, 000 | 30. 30 | $24, 200, 000 | $77, 590, 000 | 31. 19 |
| Scullin Steel Co | 4, 570, 000 | 18, 220, 000 | 25. 08 | 3, 720, 000 | 5, 720, 000 | 65. 03 |
| American Steel Foundries Co | 25, 890, 000 | 73, 520, 000 | 35. 21 | 25, 910, 000 | 40, 040, 000 | 64. 13 |
| General Steel Castings Co | 10, 350, 000 | 34, 640, 000 | 29. 88 | 10, 500, 000 | 29, 130, 000 | 36. 05 |
| Continental Foundry & Machine Co | 8, 290, 000 | 37, 966, 000 | 21. 84 | 7, 680, 000 | 13, 981, 000 | 54. 93 |
| The Symington-Gould Corp | 5, 280, 000 | 16, 690, 000 | 31. 64 | 4, 670, 000 | 10, 390, 000 | 44. 95 |
| National Malleable & Steel Co | 8, 730, 000 | 34, 210, 000 | 25. 52 | 9, 050, 000 | 29, 820, 000 | 30. 35 |
| Pelton Steel Casting Co | 306, 426 | 1, 998, 212 | 15. 33 | 512, 819 | 1, 960, 832 | 26. 15 |

The following schedule reflects the ratio of current assets to current liabilities for petitioner and these same 7 companies for 1945 and 1946 upon the basis of the same data sources as the previous schedule:

| Company | 1945 | | | 1946 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Current assets | Current liabilities | Ratio of current assets to current liabilities | Current assets | Current liabilities | Ratio of current assets to current liabilities |
| American Brake Shoe Co | $29,400,000 | $5,900,000 | 5.0:1 | $33,000,000 | $8,700,000 | 3.8:1 |
| Scullin Steel Co | 5,130,000 | 560,000 | 9.2:1 | 4,080,000 | 360,000 | 11.3:1 |
| American Steel Foundries Co | 31,590,000 | 5,710,000 | 5.5:1 | 28,810,000 | 2,910,000 | 9.9:1 |
| General Steel Castings Co | 13,300,000 | 2,950,000 | 4.5:1 | 13,810,000 | 3,310,000 | 4.2:1 |
| Continental Foundry & Machine Co | 13,730,000 | 2,110,000 | 6.5:1 | 13,900,000 | 3,270,000 | 4.3:1 |
| The Symington-Gould Corp | 6,670,000 | 1,390,000 | 4.8:1 | 5,650,000 | 980,000 | 5.8:1 |
| National Malleable & Steel Co | 12,610,000 | 3,890,000 | 3.2:1 | 13,840,000 | 4,790,000 | 2.9:1 |
| Pelton Steel Casting Co | 514,319 | 207,893 | 2.47:1 | 814,033 | 301,214 | 2.70:1 |

Petitioner did not declare or pay any dividends to its shareholders out of earnings and profits in 1943, 1944, 1945, or 1946.

Toward the end of 1945, Ehne, having decided to retire from the business, looked for an opportunity to sell the assets of the petitioner or his stockholdings therein. Fawick also decided to withdraw, and allied himself with Ehne. Together they controlled 80 per cent of the outstanding capital stock. Ehne conducted the negotiations in petitioner's name, as president. Fawick was also active in seeking prospective purchasers. The price asked for the company was $1,500,000. No purchaser was attracted. They made even more vigorous attempts, employing a brokerage firm, in 1946. The price asked remained the same. Their efforts still failed to produce a buyer, at the price asked, in 1946. Petitioner's net worth as of November 30, 1945 and 1946, was as follows:

|  | *1945* | *1946* |
| --- | --- | --- |
| Capital stock issued and outstanding | $150,000.00 | $150,000.00 |
| Capital surplus | 20,740.00 | 20,740.00 |
| Earned surplus | 255,165.28 | 921,089.78 |
|  | $425,905.28 | $1,091,829.78 |

Its total assets at these dates were as follows:

| *November 30* | *Total assets* |
| --- | --- |
| 1945 | $633,798.36 |
| 1946 | 1,393,043.67 |

Slichter, who had made petitioner his life's work—developing close personal contacts with its customers and becoming largely responsible (especially after Leekley's withdrawal) for employee relations—was very concerned that petitioner might become a "captive foundry" (viz, controlled by a large steel company, toward the filling of whose sole requirements its operation would then become devoted). He was

also concerned about the attendant changes in the nature of its business (viz, the loss, in effect, of its corporate personality) as well as the possibly deleterious effects on employee relations and the status of "key men" in the organization as it existed. Slichter did not like the idea of petitioner's becoming a subsidiary of some out-of-town corporation and of having his employee policies interfered with.

On November 9, 1946, Slichter expressed his concern to petitioner's banker (and his own personal friend), Kruyne, who first suggested that Slichter buy out the other interests. He also suggested that a plan could be devised by the bank's attorney whereby petitioner itself could use its own funds to buy up and redeem the interests of Ehne and Fawick at the price they asked and leave Slichter as the sole controlling shareholder. The banker gave no consideration to the reasonableness of the price Ehne was asking because he felt that the price had been fixed as a result of the negotiations between Slichter and Ehne with which he was not going to interfere. Slichter did not try to personally borrow the funds needed to buy Ehne's and Fawick's interests and did not have enough money to entertain a purchase without a loan. As the banker was not too familiar with the legal implications of the alternative plan suggested, he advised Slichter to consult Malcolm Whyte, a lawyer with whom the banker had been associated in some reorganizations, to work out the final details.

At the time (November 9, 1946) that the plan was originally considered, there was available to Slichter and Kruyne an interim balance sheet of petitioner's assets, liabilities, and net worth as of October 31, 1946, which reflected the following round amounts:

| | |
|---|---:|
| Cash | $545,000 |
| Total current assets | 843,000 |
| Total assets | 945,000 |
| Total current liabilities | 329,000 |
| Capital stock outstanding | 150,000 |
| Surplus | 458,000 |

The plan finally developed [5] required as its critical feature a loan to petitioner in the amount of $500,000 to make up for the drain on petitioner's working capital. Another essential aspect, because of the desire to marshal as much cash as possible to meet Ehne's asking price, was that petitioner not declare or pay a dividend in 1946.

---

[5] The proposed reorganization was, briefly, as follows:
Present capitalization consists of 1,500 shares of common stock divided as follows:
  900 shares (60 per cent) to Arthur J. Ehne
  300 shares (20 per cent) to Allen M. Slichter
  300 shares (20 per cent) to T. L. Fawick
It was proposed that petitioner be recapitalized into $1,000,000 in preferred and $500,000 in common stock, and that these new holdings be disposed of as follows:

When notified by Slichter of the plan, in November 1946, Ehne agreed to give Slichter full opportunity to execute it.

Slichter had great difficulty obtaining a loan for petitioner. Three insurance companies, a New York and a Chicago bank, and an investment trust were approached and all refused. Petitioner's own bank refused at first. All felt the corporation was "too thin" for such an undertaking ( viz, should not use $800,000 of its liquid assets [including the $500,000 to be loaned to replace the tapped portion of petitioner's then existing working capital] under the circumstances, to acquire its own outstanding capital stock and then be left with a sharply depleted working capital to meet all the requirements of its operation).

Per its audit report dated February 15, 1947, petitioner's cash position at the close of its 1946 fiscal year (November 30) had reached $590,000 and total current assets amounted to $814,000; total current liabilities stood at $301,000 (working capital thereby amounting to more than $500,000) ; and total accumulated earnings and profits had reached $921,000. Working capital was shown to be increasing at the rate of $15,000 a month. Finally, after enlisting the aid of loan brokers, a 10-year $500,000 loan agreement was consummated on April 17, 1947, whereby an insurance company covered $300,000 thereof, to mature in the last 6 years, and petitioner's bank covered $200,000, to mature during the first 4 years. Thereafter, on May 31, 1947, the loan was actually made and the plan was effected. A mortgage on petitioner's plant and an insurance policy on Slichter's life were

| Name | Stock Received | | Disposition of Stock | |
| --- | --- | --- | --- | --- |
| | Common | Preferred | Common | Preferred |
| A. J. Ehne | $300,000 | $600,000 | $300,000 to be sold to company for cash. | $300,000 to be sold to company for cash. 300,000 to be sold to A. M. Slichter for $300,000 installment note, with $300,000 preferred as collateral. |
| T. L. Fawick | $100,000 | $200,000 | $100,000 to be sold to company for cash. | $100,000 to be sold to company for cash. 100,000 to be given to Fawick's daughters. |
| Allen M. Slichter | $100,000 | $200,000 | | $200,000 to be given to company for no consideration. |

It will be seen that this program required:
  (a) $800,000 cash for purchase of stock from Ehne and Fawick:
    (1) $400,000 preferred
      (A) $300,000 to Ehne
      (B) $100,000 to Fawick
    (2) $400,000 common
      (A) $300,000 to Ehne
      (B) $100,000 to Fawick
  (b) $300,000 note from Allen M. Slichter to A. J. Ehne for purchase of $300,000 preferred.
Of this $800,000 cash required it was expected $500,000 would be realized from loans and that $300,000 would be available from working capital.

posted as collateral. A consideration of Slichter's personal ability to continue petitioner's operation successfully influenced the ultimate decision to agree to a loan. The insurance company's decision was also influenced by petitioner's financial status as reflected in a "Pro Forma Balance Sheet" for February 28, 1947, which contained a prospective adjustment to increase the book values for its plant and equipment some $362,000, and, accordingly, capital surplus as well, prepared pursuant to an investigation, analysis, and appraisal by an engineer at the insurance company's request. The "working capital stop" (i. e., the lowest point to which the lenders had to allow the borrower's working capital to fall before they could elect to exercise the right, which they reserved under the loan agreement, to mature the borrower's obligations and place themselves in an equal position with the borrower's other creditors) eventually negotiated by the parties was $200,000.

The respective amounts of the personal income tax actually paid by A. J. Ehne for 1946 and the estimated amount of tax for which he would have been liable had all of the 1946 earnings and profits ($209,731.58) been distributed in the form of a dividend in that year and had his 60 per cent thereof (some $126,000) in addition to his other income for that year ($47,063.93, per his tax return) been taxed to him at ordinary income rates, are as follows:

| Actual | Estimated | Estimated difference |
|---|---|---|
| $22,786.73 | $124,955.96 | $102,169.23 |

The tax paid by A. J. Ehne in 1947 on the $603,571 gain realized under the plan on the retirement of his interest in petitioner under the elective alternative tax rates in effect was approximately $150,000.

If the transaction had been carried out by distributing all of the earnings for fiscal year 1946, and reducing the purchase price of Ehne's interest *pro tanto*, Ehne would have paid approximately $102,000 additional tax in 1946 and approximately $119,300 tax on capital gains in 1947 (being one-fourth of $477,571, which represents the sale price of $603,571 less $126,000 of dividends). The total of his tax attributable to the transaction if accomplished as above indicated would have been approximately $221,300 instead of the actual tax attributable thereto paid by him in 1947 in the amount of approximately $150,000, at capital gains rates.

On its Federal income tax return for its fiscal year ended November 30, 1947, Ehne was shown as full-time president until June 1, 1947, and part-time thereafter. Slichter was shown as full-time vice president and secretary, and Fawick was listed as vice president until June 1, 1947. In its return for November 30, 1948, Ehne was still the president (but on a part-time basis) while Slichter was listed as full-time vice president and secretary, and Fawick was no longer

shown. Both returns were signed by Slichter, however, on the line for "President or other principal officer."

Petitioner's earnings and profits for fiscal 1946 were accumulated beyond the reasonable needs of its business. Petitioner was availed of during its fiscal year ending November 30, 1946, for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed.

OPINION.

The principal issue presented is whether the respondent correctly determined, within the purview of section 102 of the Internal Revenue Code of 1939, that petitioner, during its fiscal year 1946, was availed of for the purpose of preventing the imposition of the surtax upon its shareholders by permitting earnings and profits to accumulate in the amount of $209,731.58 instead of dividing and distributing all or a part of them.

Petitioner supports its contention that the accumulation of its earnings and profits for 1946 was necessary and reasonable on two grounds: First, that the decision to declare a dividend was justly deferred until the end of the fiscal year because of general economic uncertainties and that by the time the fiscal year had drawn to a close a plan of recapitalization (the Ehne-Fawick transaction) had been adopted, as an allegedly necessary and reasonable need of the business, which—as constituted—entirely foreclosed any dividend declaration or payment; and, secondly, that in addition to and notwithstanding this, the accumulation was necessary and reasonable to provide for the additional improvements to its plant and facilities which were made up to and including 1954.

The pressing business need which petitioner advances in support of its first ground is that the Ehne-Fawick deal was essential to the preservation of its corporate existence. That is, petitioner argues, Ehne's decision to sell petitioner's assets (or, at least, his and Fawick's combined 80 per cent interest therein) placed the successful operating policies with its employees and customers, which had been developed largely through the efforts of Slichter, its vice president and holder of a 20 per cent interest in the company, in jeopardy if, as it might have happened, some large out-of-town company had become interested and, by its purchase of said controlling interest, had made petitioner a so-called captive foundry. Because Slichter, whose plan Ehne approved, was concerned about retaining petitioner as he knew it and keeping the key employees together, argues petitioner, it was desirable from an economic and business standpoint to give the junior owner (Slichter) a chance to buy out the senior owner (Ehne, with whom

Fawick was joined). Petitioner then closes its argument with the dual assertion that, on the one hand, the use of business assets to buy out retiring shareholders of a small, closely held corporation is a standard and accepted business practice (relying on *Dill Manufacturing Co.*, 39 B. T. A. 1023 (1939), and *Gazette Publishing Co.* v. *Self*, 103 F. Supp. 779 (D. C. Ark., 1952)) and, on the other hand, that there was no other feasible way to accomplish the desired end except to let the junior owner risk thinning down the corporation by using its assets for the purchase.

It is respondent's position that the purchase and retirement by petitioner of 80 per cent of its own outstanding stock did not constitute a reasonable business need of its own, but rather suited the personal or business needs of its shareholders; and that the evidence compels the conclusion that the interdicted statutory purpose was present in the redemption scheme. Respondent notes, in support of his contentions, that only theoretical benefits to itself (or the avoidance of theoretical harms) have been claimed by petitioner; whereas, very real and immediate personal benefits were realized by its controlling shareholder, and, in addition, significant benefits also inured to Slichter to be realized in the future. Furthermore, respondent argues, the substance of the transaction could have been accomplished with the prior declaration of a dividend, which procedure was not adopted because of the tax consequences. Respondent's position is that, after the declaration of a dividend, petitioner's assets and surplus would have been depleted and Ehne's asking price (which originally exceeded net worth book values in 1945 by some $866,000, had not been accepted in the open market, and had not been increased in 1946 while net worth had increased some $759,000) would as a matter of course have been reduced accordingly. While Ehne, then, would have received the same amount of money or other property, a part of it would have been taxable as ordinary income at advanced surtax rates. (Of course, Slichter, and Fawick, too, would have been liable for tax at ordinary income rates if a dividend had been declared.) As the plan operated, however, respondent observes, petitioner's controlling shareholder acquired his share of virtually all of the petitioner's accumulated earnings and profits (including the amount in question for 1946) and paid a capital gains tax thereon in a later year, 1947. In view of such assertedly overwhelming benefits to its controlling shareholder in comparison with those, if any, to petitioner, and tax savings so substantial to all shareholders, respondent concludes that it is unbelievable that the critical purpose was not present in the taxable year.

The provision of the statute under consideration is penal in nature and while its plain intent must be given full effect, it should be strictly construed so as to cover only cases which fall within its letter. *Dill*

*Manufacturing Co.*, 39 B. T. A. 1023 (1939); *United Business Corporation of America*, 19 B. T. A. 809 (1930), affd. 62 F. 2d 754 (C. A. 2), certiorari denied 290 U. S. 635 (1933). Absent the condemned *purpose*, the effect alone of tax savings is not a foundation for imposition of the additional surtax. *R. L. Blaffer & Co.*, 37 B. T. A. 851 (1938), affd. 103 F. 2d 487 (C. A. 5), certiorari denied 308 U. S. 576; *C. H. Spitzner & Son, Inc.*, 37 B. T. A. 511; *C. B. DeMille*, 31 B. T. A. 1161 (1935), affd. 90 F. 2d 12, certiorari denied 302 U. S. 713. The effect, however, is evidence of the purpose, because it may reasonably be inferred that the controlling interests intended the obvious and natural consequences of their acts. See *Helvering* v. *National Grocery Co.*, 304 U. S. 282, reversing 92 F. 2d 931 (C. A. 3), and affirming 35 B. T. A. 163 (1936).

Subsection (c) of section 102 provides, *inter alia*, that if the accumulation for the period in question is "beyond the reasonable needs of the business," that fact "shall be determinative" of the interdicted purpose "unless the corporation by the clear preponderance of the evidence shall prove to the contrary." However, the fact that an accumulation exceeds reasonable business needs, it is clear, raises only a rebuttable presumption of the existence of the decisive purpose which can be overcome by evidence showing absence thereof. *Helvering* v. *National Grocery Co.*, *supra*. Thus, the statute may be found not to apply in some cases where the accumulations are unreasonable (*Gus Blass Co.*, 9 T. C. 15, 37 (1947)) or, conversely, may be held to apply where they are reasonable (*United Business Corporation of America*, *supra*; *Helvering* v. *Chicago Stock Yards Co.*, 318 U. S. 693, reversing 129 F. 2d 937 (C. A. 1), and affirming 41 B. T. A. 590 (1940); *Whitney Chain & Mfg. Co.*, 3 T. C. 1109 (1944), affirmed per curiam 149 F. 2d 936 (C. A. 2); *Trico Products Corporation*, 46 B. T. A. 346 (1942); *Semagraph Co.* v. *Commissioner*, 152 F. 2d 62 (C. A. 4, 1945), affirming a Memorandum Opinion of this Court). Hence, reasonableness or unreasonableness of an accumulation may constitute a factor in arriving at the ultimate determination, but the statutory prohibition may apply irrespective thereof whenever the proscribed purpose appears. *Wilkerson Daily Corporation, Ltd.*, 42 B. T. A. 1266 (1940), affd. 125 F. 2d 998 (C. A. 9); *United States* v. *Tway Coal Sales*, 75 F. 2d 336 (C. A. 6, 1935).

Though intent is a state of mind, it is nevertheless a fact to be proved and found as are other facts. *William C. De Mille Productions, Inc.*, 30 B. T. A. 826, 829 (1934). Of course, the corporation's intent will be considered to be that of those responsible for its acts. *Helvering* v. *National Grocery Co.*, *supra*. In this regard, while the testimony of petitioner's officers and shareholders is entitled to some weight, the issue is to be resolved in the light of all of the surrounding circum-

stances, including, of course, the interests of those in control, and their actual conduct. *William C. De Mille Productions, Inc., supra; Belaire Management Corporation,* 21 T. C. 881 (1945).

We think it is clear that where, as in the instant case, the statutory notice of deficiency is based upon the premise that petitioner was availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, the ultimate burden of proof of error is upon petitioner.[6]

Petitioner's evidence must be directed to a complete lack of the proscribed purpose (*R. L. Blaffer & Co. supra; World Publishing Co.* v. *United States,* 72 F. Supp. 886 (N. D., Okla., 1947), affd. 169 F. 2d 186 (C. A. 10), as the existence of even a bona fide business purpose is not inconsistent with another purpose to reduce the surtax burden of its shareholders. *Whitney Chain & Mfg. Co., supra; Nipoch Corporation,* 36 B. T. A. 662 (1937). Thus, where a closely held corporation adopts some plan (even having as its purpose the satisfaction of an otherwise bona fide business need) which prevents the distribution of earnings and profits, with the attendant result that the imposition of the surtax in substantial amounts on its controlling shareholders is avoided in whole or in part (in that the nature of the underlying income is changed from ordinary income to capital gains), or deferred, and, but for the tax saving, the same result could have been accomplished—insofar as both the corporation and its controlling shareholders are concerned—with the declaration and payment of a dividend, the aforementioned effect will be accorded significance as indicative of a probable purpose to induce it. *Helvering* v. *Chicago Stock Yards Co., supra; R. L. Blaffer, supra; Trico Products Corporation, supra,* at 378–380; *Latchis Theatres of Keene, Inc.,* 19 T. C. 1054 (1953), affd. 214 F. 2d 834 (C. A. 1). The existence of such obvious alternatives for achieving the same end, of which those controlling a petitioner's activities could not realistically have been ignorant, would serve to contradict the contention that the alleged bona fide need was the sole reason for the failure to distribute accumulated earnings and profits. *Helvering* v. *National Grocery Co., supra; Whitney Chain & Mfg. Co., supra; World Publishing Co.* v. *United States, supra; Trico Products Corporation, supra; Semagraph Co., supra.*

---

[6] We assume, *arguendo,* that petitioner has substantially complied with the requirements of section 534 of the Internal Revenue Code of 1954, as amended (the relevant provisions of which are set forth, *infra*), and that the burden shifts to the respondent to the extent, if any, that his determination is based upon the theory that earnings and profits were accumulated beyond the reasonable needs of the business, and upon the presumption (section 102 (c) of the Code of 1939) arising therefrom. We do not think this factor is essential to our decision in the instant case, but assuming, *arguendo,* that it is, it is our view upon consideration of the whole record that respondent has met his burden. See discussion, *infra.*

As noted in our introductory remarks, respondent has conceded the issue with regard to 1945, the first of the 2 taxable years originally involved herein. This leaves only the determination with regard to the taxable year 1946 for our consideration. Since we are convinced from our careful study of the entire record that those considerations which revolved about the stock purchase and retirement plan—petitioner's first ground of reliance—were chiefly responsible for petitioner's failure to declare or pay dividends out of the earnings and profits accumulated during its fiscal year ended November 30, 1946, rather than any planned program of plant expansion or improvement (as to which ground we will comment, *infra*), our decision of this issue turns largely upon our acceptance or rejection, in the light of the circumstances herein, of the first ground as satisfying the intent of section 102. Our ultimate decision, of course, will turn, in any event, upon our conviction upon the basis of the entire record as to the existence of the proscribed statutory purpose herein.

A significant factor in the present record is that the plan of recapitalization and all of its announced ends could have been achieved notwithstanding the declaration of a dividend out of accumulated earnings and profits for 1946. The only apparent deterrent was that widely divergent tax consequences would have resulted. As our findings of fact indicate, the advice and insistence of petitioner's banker and others reviewing the plan that no further assets be committed to a declaration and payment of dividends in 1946 was predicated upon acceptance as final of the understanding that (1) the full amount asked by Ehne would be met by petitioner, and (2) such amount was to be paid in the form of a redemption or retirement of the 80 per cent stock interest. As respondent urges, it does appear that if a dividend had been declared out of accumulated earnings and profits, it might reasonably be expected that Ehne's asking price for the 80 per cent interest would have been reduced *pro tanto* (except for tax consequences). No more cash would have been required; petitioner's financial status or working capital would have been no differently affected; and Ehne would have received, in all, the same amount as asked. No real or immediate benefit to petitioner's business was accomplished by the transaction. If anything, the payment of $300,000 in cash and the borrowing of $500,000 more was harmful to the business because of the drain on its financial resources. It does not impress us as at all "businesslike," in principle, for petitioner to have appropriated $800,000 of its cash to acquire its own stock, and to have saddled itself with a $500,000 liability in the process, at a time when it claims it considered that its working capital was insufficient and also that it was necessary to devote its accumulated earnings and profits to improve its plant facilities so as to better its competitive position in the in-

dustry. Ehne could not attract any other purchaser at the price asked, and it is of some significance that there is no evidence that any effort was made on behalf of the corporation to strike a better bargain with Ehne.

The harms alleged by petitioner which it sought to avoid by effectuating the plan proposed by Slichter were, at best, only conjectural and have not been shown to have had any real basis in fact. Sale by Ehne to an "outsider" was not imminent. In fact, from the present record, it was hardly even likely (certainly, not at the price asked).

The practical answer to all this, unfavorable to petitioner's case, is that its actions, purpose, and intent were those of its controlling shareholders, who sold their interests at a favorable price and at the same time realized substantial tax benefits from adopting the plan in the form described herein. For much the same reasons, the cases chiefly relied upon by petitioner can be readily distinguished. In *Dill Manufacturing Co.*, *supra*, to begin with, the entire burden of proof as to the existence of the interdicted purpose was upon the respondent, as his determination thereof was claimed by affirmative allegation in his amended answer. Moreover, respondent there relied upon, but could not prove, his contention that the liquidation involved therein, which required the accumulation of earnings and profits for its effectuation, was planned many years before when a syndicate whose interests were then being retired by the petitioner originally acquired its interests therein. Likewise, the Court held, upon the affirmative evidence, that the Dill plant and construction facilities represented a large part of its accumulations which were reasonably needed and actually used in the business. Finally, the *Dill* case involved the purchase of a *minority* stock interest.

In *Gazette Publishing Co.* v. *Self*, *supra*, the determining factors were that petitioner acquired the interest of the dissenting *minority* stockholders so as to maintain intact the management and editorial policy of the majority and, while the price asked for the minority stock exceeded its fair market value, petitioner's officers knew that sale to outsiders at that price was imminent. Moreover, the court, in its analysis, emphasized the significant fact that the *Dill* case also involved the purchase of a minority stock interest under related circumstances. In the instant case, it was the *majority* will to dispose of petitioner at the best terms possible. The plan of recapitalization, which was entirely, if not ideally, subservient to these ends, could not have been accomplished without the action of the majority interests.

We do not attach any significance to the subordinate basis upon which petitioner would rest its principal ground—viz, that the de-

cision whether to declare and pay a dividend in 1946 was deferred until late in the calendar year because of economic uncertainties. The record shows that, with rare exception (e. g., depression years), petitioner regularly declared and paid substantial dividends from current earnings and profits a number of times throughout the course of each operating year from 1926 to 1942. No dividends were declared or paid out of earnings and profits in 1943 or 1944, but in those years the R. F. C. loan agreement was in effect which prevented such declarations and payments. None was declared or paid for 1945 either, but the respondent now concedes that there is no section 102 liability for that year, although it was originally in issue. Net profits after taxes (per books) for 1943, 1944, and 1945, respectively, were $28,529, $71,708, and $45,908. Petitioner closed out in advance, in one lump-sum payment on October 27, 1945, the balance of its long-term obligation to the R. F. C. after having made a regular payment on October 18. Petitioner was not hampered by labor unrest as were the other members of the industry. Petitioner's audit statements do not show any sharp rise or fluctuation in the cost of its raw materials in 1945 or 1946. Petitioner's sales volume did not suffer to any significant degree. Petitioner's experience with regard to aging and collectibility of accounts receivable was good. Excess profits taxes were removed after, or applied only to, the first month (December 1945) of its 1946 fiscal year.

We also note that petitioner's customers were not the typical "large" customers in the industry (e. g., railroads). Its production was not seriously affected by the major strikes during 1946. Moreover, petitioner's earnings history does not indicate that its experience conforms to the "feast or famine" pattern in the industry.

Petitioner also emphasizes certain comparative financial ratios having to do with the working capital, sales, cash, and current asset and liability positions of itself and 5 other Wisconsin steel casting companies for the years 1945 and 1946 in attempting to demonstrate the need to accumulate all of its 1946 earnings. These ratios are fully set forth in our Findings of Fact. In our analysis thereof, preliminary to drawing any conclusions therefrom, we have gone beyond the bare amounts of the ratios and have given consideration to their derivative components so as to gain an insight into the actual financial conditions purportedly evidenced thereby. It is our view, upon the basis of such analysis, that the ratios do not lead to the conclusion that petitioner's competitive position was such as to require it, as a reasonable need of its business, to accumulate all of its 1946 earnings and profits. (For discussion of general principles applicable to the ratios under consideration, see Finney, Principles of Accounting (3d

ed.), chapter 27, entitled "The Analysis of Working Capital.") We may add that the inconsistency of petitioner's position in this respect with the use of a substantial part of its funds to consummate the Ehne-Fawick deal seems apparent. See also discussion, *infra*.

Since the figures and ratios are available in our findings, we do not think a detailed discussion is called for. Merely as illustrative of our views, we note (a) that with respect to each of the ratios considered, petitioner's condition improved in 1946 over 1945, and (b) that such improvement appears to have been, if anything, healthier than that of a majority of the 5 other Wisconsin companies, all but one of which showed a substantial decrease in net sales in 1946, while petitioner's net sales were maintained at almost as high a level in 1946 as in 1945.

With respect to the 7 very large companies selected by petitioner's expert witness and listed in Standard & Poor's reports or Moody's Manual, the ratios of working capital to sales and current assets to current liabilities are more favorable than those of petitioner. It seems clear, however, that these companies are not in any realistic sense comparable to petitioner. We do not think that their more favorable ratios demonstrate either that petitioner was in an unhealthy financial condition in 1946 or that petitioner was required to retain all of its earnings for that year in order to maintain its competitive position in its own particular field. Again, petitioner's use of a substantial part of its funds to consummate the Ehne-Fawick deal appears inconsistent with its contention.

Upon the basis of the foregoing discussion, we conclude that petitioner was clearly "out of the woods" financially by the close of fiscal 1945 (at which time, as petitioner's counsel stated, Ehne "decided he'd like to sell out and make his money and quit"), and that reasons other than its own operational needs prompted its failure to declare and pay dividends out of current earnings during 1946 and prior to November 30 of that year.

Of course, the board of directors or officers of a corporation are entitled to exercise their judgment in these matters. However, the ultimate determination in each case, as it arises, is a judicial one to be decided in the light of all the circumstances and applicable rules. *World Publishing Co.* v. *United States*, 72 F. Supp. 886 (N. D., Okla., 1947), affd. 169 F. 2d 186 (C. A. 10). Thus, in *Whitney Chain & Mfg. Co., supra*, we said (p. 1120):

The existence of such obvious alternatives for achieving the same end, of which the directors could not have been ignorant, contradicts the statement * * * [regarding] the sole reason for the failure to distribute [current earnings and profits] * * *

We had earlier emphasized, while noting that effect of avoidance per se is not the foundation for the tax in question (*R. L. Blaffer & Co., supra,* at 856) that:

This is not to say that the effect is of no significance, for it may, and perhaps often does, indicate the probability of a purpose to induce it. In ordinary life it is not unreasonable to infer that the effect of a voluntary act is among the purposes of the actor. So long as the inference be not arbitrary and evidence to the contrary be entertained and fairly weighed, it may be regarded as reasonable.

Also see *Trico Products Corporation, supra,* at 378–380.

The very substantial and obviously anticipated tax savings to the controlling shareholders accruing from the Ehne-Fawick transaction, as already indicated, make it impossible under the attending circumstances to accept the view that the interdicted purpose did not to some degree permeate the plan. *Helvering* v. *National Grocery Co., supra; Latchis Theatres of Keene, Inc., supra.* We hold from all of the foregoing that petitioner has failed to sustain its burden of proof in relying upon the Ehne-Fawick plan as excluding the purpose to avoid the payment of surtax by its majority stockholders.

Next, we find no merit in petitioner's alternative ground based upon the claim that the reasonable needs of the business required accumulation of all of its 1946 earnings. We are convinced from our careful consideration and analysis of all of the relevant testimony and documentary evidence—the results of which are set forth in our Findings of Fact—that there was no immediate or then reasonably anticipated business need in the way of plant expansion or improvement of facilities which required petitioner to accumulate all of its earnings and profits for 1946. Indeed, it appears anomalous to suggest that the use of the earnings was required for the reasonable needs of the business (other than the Ehne-Fawick plan) when they were in effect siphoned off to effectuate the plan itself in a form which was clearly calculated to save surtaxes. The main program of plant revision had been accomplished pursuant to the certificates of necessity during World War II. What loose ends there may have been in this program seem clearly to have been accomplished prior to 1950. A definite cleavage occurs at that point in the pattern of plant improvement and expansion expenditures, the trend declining sharply and picking up again in and around the time of the United States participation in the United Nations police action in Korea. We do not feel that this latter event or the expansion in petitioner's facilities resulting therefrom could have been within the reasonable contemplation of the petitioner in 1946. As regards petitioner's contemplation in 1946 of the additions made between 1946 and 1950, the testimony of petitioner's own officers only covered a shakeout and a crane, the total estimated cost of which (about $100,000) could have been met either out of only

a part of the earnings of over $200,000 accumulated in 1946 (except for the impact of the Ehne-Fawick deal) or out of reasonably anticipated earnings and profits for the years immediately following 1946. See *Helvering* v. *National Grocery Co.*, 304 U. S. 282; *Trico Products Corporation*, 46 B. T. A. 346, 374–375; *Olin Corporation*, 42 B. T. A. 1203, affd. 128 F. 2d 185 (C. A. 7, 1942); *Whitney Chain & Mfg. Co.*, 3 T. C. 1109, 1119, affirmed per curiam 149 F. 2d 936 (C. A. 2, 1945); *World Publishing Co.* v. *United States, supra; United Iron & Metal Co.* v. *Commissioner*, 205 F. 2d 152 (C. A. 3, 1953), affirming per curiam a Memorandum Opinion of this Court. Cf. *J. L. Goodman Furniture Co.*, 11 T. C. 530 (1948); *Universal Steel Co.*, 5 T. C. 627 (1945); *General Smelting Co.*, 4 T. C. 313 (1944).

Because the retroactive impact of section 534 of the 1954 Code, as amended, upon these proceedings came at a time shortly before the hearing, the parties elected to go ahead with the trial in the traditional manner—petitioner being the first to go forward with the evidence—and to reserve to argument on brief their expression of views regarding the effect of the new statutory provision upon proceedings such as these.

The substance of section 102 of the 1939 Code (viz, subparagraphs (a), (b), (c), (d), and (f)) was translated into a series of sections in the 1954 Code (viz, sections 531, 532, 533, 535, and 536). Some new sections (sec. 534 and 537) relative to this general area of the law were also added, which had no counterparts in the 1939 Code. We now consider the effect of section 534, entitled "Burden of Proof," upon existing law regarding burden of proof in these cases. We have found it helpful in determining the legislative intent underlying this new provision and the manner in which it is to be interpreted to review and compare the over-all framework of the applicable 1939 and 1954 Code "accumulated earnings tax" provisions. The place occupied by section 534 in the framework of the latter is indicative of the role it is to play in accomplishing the ends sought to be achieved by the spirit of said tax. (See S. Rept. No. 1162, 84th Cong., 1st Sess., 1955–2 C. B. 884.) Our review and comparison of the relevant provisions of the two Codes, as amended, reveals that, except for section 534, there has been no change here significant in the complexion of the so-called accumulated earnings tax provisions. Section 534, it will then be noted, is first limited by its express reference to those Tax Court proceedings "involving a notice of deficiency based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business," and then goes on to state a series of rules, under certain circumstances, regarding "the burden of proof with respect to such allegation."

The Senate Finance Committee, in its general remarks describing the reasons for incorporating section 534 into the statutory framework said:

At the present time if the Commissioner of Internal Revenue proposes a deficiency *on the ground that the taxpayer has accumulated earnings and profits in excess of the reasonable needs of the business*, the taxpayer has the burden of proof as to the reasonableness of the accumulation. Moreover, if earnings and profits are accumulated in excess of the reasonable needs of the business, the accumulation is deemed to be for the purposes of tax avoidance unless the taxpayer proves otherwise by the clear preponderance of the evidence.

Your committee agrees with the House that this imposition of the burden of proof on the taxpayer has had several undesirable consequences. The poor record of the Government in the litigated cases in this area indicates that deficiencies have been asserted in many cases which were not adequately screened or analyzed. At the same time taxpayers were put to substantial expense and effort in proving that the accumulation was for the reasonable needs of the business. Moreover, the complaints of taxpayers that the tax is used as a threat by revenue agents to induce settlement on other issues appear to have a connection with the burden of proof which the taxpayer is required to assume. It also appears probable that many small taxpayers may have yielded to a proposed deficiency because of the expense and difficulty of litigating their case under the present rules. [S. Rept. No. 1622, 83d Cong., 2d Sess., p. 70. Emphasis added.]

The manner in which the section would operate was explained as follows in the committee's detailed remarks:

The section, as amended by your committee, provides that in certain cases before the Tax Court *the burden of proving* that all or any part of an accumulation of earnings and profits is in excess of *reasonable needs of the business shall be on the Secretary* or his delegate. Under present law, the burden of proof is on the taxpayer. The bill provides that in order for the burden of proof to be shifted, the taxpayer, having received notification from the Secretary or his delegate that it is intended to assess a deficiency based in whole or in part on the accumulated earnings tax, must submit a statement indicating why the needs of the business require the retention of earnings and profits, together with facts sufficient to show the basis thereof. If the taxpayer does not file such a statement, he must bear the *entire* burden of proof *as under existing law.* In addition, if the taxpayer presents grounds in his statement which are not supported by the facts sufficient to show the basis thereof, the burden of proof with respect to such grounds must be borne by the taxpayer. If the Secretary or his delegate fails to give the taxpayer notification prior to the issuance of a notice of deficiency (except in the case of a notice issued after a jeopardy assessment), then the Secretary or his delegate must bear the burden of proof even though the taxpayer has filed no statement.

\* \* \* \* \* \* \*

*The technical amendments* made by your committee *make clear that the shift in the burden of proof* under section 534 *applies where the issue* between the Government and the taxpayer *relates to* the portion of the earnings and profits which may be accumulated during the taxable year for *the reasonable needs of the business.* [S. Rept. No. 1622, *supra*, at 315. Emphasis added.]

The Senate Finance Committee again remarked (S. Rept. No. 1162, *supra*), with regard to section 534, when submitting proposed amendments thereto in sections 4 and 5 of the Act of August 11, 1955,[7] that "the burden of proof in certain cases involving the accumulated earnings tax will be on the Government rather than the taxpayer." The committee further said in the foregoing general statement:

the burden will be on the Government in cases involving taxable years to which the Internal Revenue Code of 1939 applies in the case proceedings tried on the merits after the date of enactment of this bill [August 11, 1955] *if* the burden of proof would have been on the Government had *the deficiency been such that section 534* of the 1954 Code (as originally enacted) *applied.*

The relief that this provision will grant to taxpayers can be shown by comparison of the provisions for burden of proof under the 1939 Code as compared with the 1954 Code. * * * [Emphasis added.]

Petitioner's argument centers largely about the "reasonable needs of the business" aspect of accumulated earnings tax cases. In the course thereof petitioner notes that respondent did not make any determination in his original deficiency notice that the accumulations in question exceeded such needs but did make certain opening remarks at the hearing to that effect. Respondent's official "Registered Mail Notification Pursuant to Section 534 of the Internal Revenue Code of 1954" notifies petitioner that it may, within 30 days, submit a statement of grounds (together with facts sufficient to show the basis thereof) on which it relies to establish that all or any part of its earnings or profits have not been permitted to accumulate beyond the reasonable needs of the business. Petitioner's position is, apparently, that (even without regard to section 534) the burden of proving whether the questioned accumulations exceeded the reasonable needs of the business was thus upon the respondent, and argues that because of the paucity of evidence introduced by respondent, respondent has failed to meet his burden. Since no further argument is made respecting the effect of section 534 on burden of proof as it existed under prior law in these cases, two things would appear to be implicit in petitioner's last stated position: (1) That petitioner has complied with whatever burden is required of it, and (2) that by virtue of the present posture of the evidence it should prevail in its petition for redetermination.

Respondent contends essentially: (1) That while section 534 of the 1954 Code has established a new procedure in accumulated earnings tax cases, it does not necessarily apply to *all* such cases; (2) that even where applicable, the critical factor in each is the *purpose* of the accumulations; and (3) *to that end* the burden of proof, or the risk of nonpersuasion, as it existed under prior law has remained unchanged. Thus, respondent argues that it was not necessary for him

---

[7] Act of Aug. 11, 1955, ch. 805, 84th Cong., 1st Sess., 69 Stat. 689 (1955).

to have made the determination stressed by petitioner and, further, that even if respondent is unsuccessful in disproving one or all of the grounds relied upon by petitioner with regard to whether the questioned accumulation exceeded the reasonable needs of its business, respondent can still prevail on the ultimate and controlling issue of purpose, as the same can be established entirely apart from reasonable business needs.

For the following reasons we have concluded with regard to the interpretation and application of section 534 of the 1954 Code, as amended, that there is no basis to presume that Congress intended to alter or reverse the rules of existing law regarding petitioner's *ultimate* burden of proving in an accumulated earnings tax case such as that now before us that it was not availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed except to the extent indicated below.

(1) As indicated above, the basic statutory framework and content of the so-called accumulated earnings tax under the 1954 Code (secs. 532 and 533) setting forth the general rule and well known presumption are the same as those under the "Surtax on Corporations Improperly Accumulating Surplus" provisions of the 1939 Code (sec. 102 (a) and (c)) which adopted the provisions of section 102 (a) and (c) of the Revenue Act of 1938. The legislative history of the 1938 Act clearly expresses the intent of Congress to place the ultimate burden of proof on taxpayers.[8] There is no expression of intent in the applicable 1954 Code sections or in the legislative history to alter or reverse the existing law relative to burden of proof except with respect to accumulation of profits beyond the reasonable needs of the corporation, and then only if the requirements of section 534 are met, and, of course, if the issue is essential to decision.

(2) Subsection (a) of section 534 expressly limits the operation of that section to "any proceedings before the Tax Court involving deficiency notices based in whole or in part on the allegation that all or any part of the earnings and profits have been permitted to accumulate beyond the reasonable needs of the business." However, as set forth in the general rule announced in section 532 (a), the statutory prohibition is directed at "every corporation * * * formed or availed of for the *purpose* of avoiding the income tax with respect to its shareholders * * * by permitting its earnings and profits to accumulate instead of being divided or distributed." (Emphasis

---

[8] See S. Rept. No. 1567, 75th Cong., 3d Sess. (1939 C. B. (Part 2) 779, 782, 790), and H. Rept. No. 1860, 75th Cong., 3d Sess. (1939 C. B. (Part 2) 728, 729). The congressional intent to prevent tax avoidance through improper accumulations can be traced back to section II A, subdivision 2 [3], of the Revenue Act of 1913. See *Mead Corp.,* 38 B. T. A. 687.

added.) It is well established, as noted elsewhere herein, that the reasonable business needs of a taxpayer constitute only one factor to be weighed by the Court in reaching its ultimate determination with regard to the presence or absence of the interdicted purpose, which is the critical point of consideration in the instant case and which can be established entirely apart from considerations as to the reasonable needs of a taxpayer. Thus, although Congress clearly intended a revision in the burden of proof with respect to this latter factor, such factor must be essential to respondent's case. Only to such extent can it be taken to shift the burden to respondent, again assuming that the provisions of section 534 are complied with.[9]

(3) The conditions and limitations contained within section 534 clearly show that it is entirely possible under subsection (c) of section 534 that the burden of proving only *some* of the grounds alleged by petitioner may be shifted to respondent, and that for such reasons, as failure to file a statement of grounds or failure to state "facts sufficient to show the basis therefor," no shift at all may occur (and all this notwithstanding the further implied limitations with regard to relevancy or essentiality urged by respondent and elsewhere discussed herein).

(4) The real possibility still remains with respect to any case that while bona fide business needs may be alleged for an accumulation, and may be supported by the evidence, such needs could have been satisfied without all or part of the accumulation of earnings, leaving the real reason underlying the corporation's failure to divide and distribute earnings and profits to be the interdicted statutory purpose of preventing the imposition of income taxes on its shareholders. What we said in *Trico Products Corporation*, 46 B. T. A. 346, 374 (1942), is here apropos:

if the reasonable needs of the business are to be relied upon as a means of convincing us of the complete innocence of petitioner's purpose, this must at least require a demonstration that there was a purpose to provide for those business needs so satisfying and persuasive that it is unnecessary to look further for a motive for the action under criticism. And to this it must be added that a demonstrated purpose may be "not inconsistent with another purpose to reduce income taxes by having a corporation accumulate its gains and profits rather than distribute them." * * * And "it is to this complete lack of the condemned purpose that its evidence must be directed and if it does not fairly prove an absence of such purpose it must fail regardless of what other purposes it may prove." * * *

Even if they satisfied us that the accumulations were caused in part by the plan or purpose to provide for reasonable business needs, there would remain to be examined what is expressly advanced as the principal purpose. The incidental

---

[9] See discussion, *supra*, setting forth the pertinent portion of the detailed remarks in S. Rept. No. 1622, 85th Cong., 1st Sess.

ones would still appear as excuses, or afterthoughts, rather than evidence of an absence of the purpose described by the statute.

In any event, as demonstrated by our earlier discussion, we conclude that the circumstances surrounding the recapitalization clearly and affirmatively demonstrate that petitioner was availed of in 1946 for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed. We add, for completeness, that the burden was upon petitioner to prove the contrary, and that it has, in our opinion, failed to meet its burden of proof.

In view of the foregoing, the question of whether or not the earnings or profits of petitioner were permitted to accumulate beyond the reasonable needs of the business is not essential to our decision. Under the provisions of section 534, this is the only factor with respect to which, if material to our decision, the burden of proof could have been shifted to respondent. Assuming, *arguendo*, that it is a significant factor, and that the burden was shifted to respondent in this respect, we think the affirmative evidence demonstrates that the Ehne-Fawick deal did not represent a reasonable need of the business, and also that the earnings accumulated in 1946 (not to speak of reasonably anticipated future earnings) were materially in excess of any reasonable, planned, or needed future capital expenditures or other reasonably anticipated exigencies or contingencies of the business.

*Decision will be entered under Rule 50.*