Knoxville Iron Company v. Commissioner.
Knoxville Iron Co. v. Commissioner
Docket Nos. 56066 & 64921.
United States Tax Court
T.C. Memo 1959-54; 1959 Tax Ct. Memo LEXIS 194; 18 T.C.M. (CCH) 251; T.C.M. (RIA) 59054; March 23, 1959
*194 1. Held, during the period in issue petitioner was not availed of for the purpose of preventing the imposition of surtax upon its shareholders within the meaning of section 102, Internal Revenue Code of 1939. 2. Held, petitioner is not entitled to a bad debt deduction in 1953. 3. Held, on the facts, numerous expenditures by petitioner during the period 1950 through 1953 found to be repairs or capital expenditures. 4. Held further, respondent's determination in respect to the depreciable life of a concrete floor sustained. Thomas G. McConnell, Esq., Box 39, Knoxville, Tenn., Fred H. Cagle, Jr., Esq., and Bruce Moody, Esq., for the petitioner. George W. Calvert, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: These consolidated proceedings involve the following deficiencies in income tax for the years 1947 through 1953: Surtax
under Sec. 102
Year
Income Tax
I.R.C. 1939
1947
$ 84,892.52
1948
201,538.89
1949
74,271.79
1950
$ 250.19
49,662.47
1951
19,145.37
112,952.19
1952
21,377.26
58,095.01
1953
29,878.80
23,880.98
The issues presented for decision are: (1) was petitioner availed of for the purpose of preventing the imposition of surtax upon its shareholders in each *195 of the years 1948 through 1953, (respondent conceded this issue as to 1947); (2) was petitioner entitled to a bad debt deduction in 1953; (3) did respondent properly capitalize certain expenditures which petitioner deducted as repairs during 1950 through 1953; and (4) did respondent properly determine the rate of depreciation on a concrete floor. Findings of Fact The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner, a corporation organized in Tennessee in 1868 with its principal office and plant in Knoxville, filed its income tax returns for the years herein involved with the former collector or district director of internal revenue for the district of Tennessee. The returns were filed on the calendar year and accrual basis. Respondent sent notifications to petitioner pursuant to section 534, Internal Revenue Code of 1954, as amended, in respect to the deficiencies in surtax under section 102 involved herein. Petitioner sent respondent timely replies to these notices. At all times pertinent petitioner was engaged in the operation of a steel mill. The mill was basically a jobbing or merchant mill, involved in the specialty production *196 of steel shapes and forms to customers' orders. The mill was a hand-operated mill and due to the lack of modern mechanization its production costs were considerably higher than costs in modern mills. After the onset of World War II the OPA froze steel prices and caused petitioner's production costs to exceed the selling price of its steel. Petitioner made an attempt to continue operations, but in 1944 closed a major portion of its mill. By the end of 1944 petitioner was in a precarious financial condition. It had suffered losses from operations in 1943 and 1944 totaling over $200,000. Its working capital had decreased approximately 50 per cent, and it had only $2,126.05 cash. On January 30, 1945, petitioner's stockholders authorized H. W. Van Benschoten, then president of petitioner, to sell any or all of the assets of the corporation. No sale was made. Ivan Racheff succeeded Van Benschoten as president of petitioner on September 9, 1947. At time of trial Racheff was 65 years old, single, and had no relatives. He lived in an apartment over the offices at the mill. Racheff graduated from the University of Illinois in 1917. From 1917 to 1945 he was almost continuously engaged in the *197 production of and/or the metallurgical study of metals, particularly steel. From 1928 to 1945 he devoted a substantial portion of his time to assisting various steel producing and fabricating companies as a consultant. It was in his capacity as a consultant that he first came in contact with petitioner. In 1938 Racheff assisted petitioner with the acquisition and installation of two electric furnaces and with the training of personnel to operate them. From time to time thereafter Racheff assisted petitioner in an advisory capacity and in May 1945 accepted the position of acting general manager of petitioner's mill. Under Racheff's management, petitioner succeeded in gaining some relief from the price controls imposed upon it and operations in 1946 resulted in a profit. The following is a summary of petitioner's operations and dividends paid during the years 1942 through 1946: Tons of
Net Profit
Divi-
Net Sales
Steel
After Taxes
dends
1942
$1,675.237
33,645
$44,831
$50,000
1943
1,284,101
22,601
(82,884)
15,000
1944
533,868
8,054
(96,576)
0
1945
554,566
6,574
14,289
0
1946
1,507,624
22,616
82,784
0
The following is a summary of petitioner's financial condition as of December 31 of the years 1944 through 1946: Cur-
Reserve
Current
rent Lia-
for Depre-
Assets
bilities
ciation
Surplus
1944
$240,118
$ 2,383
$1,182,316
($284,156)
1945
354,974
28,947
1,209,842
(264,719)
1946
529,219
93,258
1,234,239
(179,625)
*198 Cash on hand and in banks as of December 31, 1942 through 1946 was as follows: 1942
$ 4,563.84
1943
45,053.56
1944
2,126.05
1945
39,281.51
1946
50,342.64
In 1945 Racheff acquired 2,002 shares of petitioner's 10,000 shares outstanding. He increased his holdings to 2,377 in 1946, and in 1947 gained control of petitioner by the acquisition of an additional 5,599 shares. During the years in issue Racheff held the following percentages of petitioner's outstanding common stock: 1948
83.56
1949
84.44
1950
84.44
1951
84.44
1952
84.44
1953
84.44
Petitioner's remaining outstanding stock was held by approximately 35 individuals. At the time Racheff gained control of petitioner the mill and most equipment were antiquated and some of the equipment was worn out or obsolete. Working conditions were poor and accidents occurred frequently. Racheff immediately embarked upon a clean-up program to improve working conditions by cleaning up debris, demolishing numerous shacks, and making alterations aimed at providing fresh air and minimizing dust. The clean-up program continued up to late 1948. In 1947 approximately $75,000 was spent for repairs and capital improvements and in 1948 approximately $113,000 was spent for this *199 purpose. In late 1947 Racheff made an exhaustive study of the mill's potentialities and limitations. He traveled to similar mills in various parts of the country to see how they were utilizing their equipment, and to get ideas on modern plant layouts. An outline of the major needs for modernization of the mill was prepared and submitted to a board of directors' meeting on December 19, 1947. It was estimated that over $625,000 was required for the modernization program exclusive of most labor and installation charges. The outline included the complete modernization of only one of the four rolling mills at a cost of approximately $250,000. The outline contained the following comments: "The present plant and equipment of the Knoxville Iron Company is in many respects antiquated and insofar, inefficient, being both slow and costly in operation and in some instances involves at least some danger. "It was demonstrated during the war that this Company, with its antiquated equipment could not compete with modern equipped plants, its labor costs per ton of finished steel running up to four or five times that obtaining in these modern plants. Therefore, under the prevalent frozen and government *200 controlled prices, the Knoxville Iron Company was forced to shut down its plant. "This company can operate profitably only under abnormal conditions, i.e. when the general demand for steel is far beyond the country's ability to meet and the prices are consequently abnormally high, as at present. "In order that this Company may continue to operate at a profit when the market conditions shall have returned to normal and when competition will have to be reckoned with, it is necessary to modernize the entire Plant. * * *
"It should be noted that the estimated costs above given do not include labor charges and installation in most cases, which will be extra. Even without the labor charges, the total estimate runs well over $600,000.00. Therefore, the contemplated modernization can be undertaken only over a period of time, beginning with the most essential changes." Portions of the minutes of the board of directors' meeting follow: * * *
"The principal matter for discussion was the question of availability of funds for undertaking the much needed modernization of the Plant and equipment, much of which is obsolete and will not allow the Company to meet future competition, espectially under *201 more normal market conditions. "A fairly complete outline of the major needs in the various departments of the Plant had been prepared, copies of which were to hand during the meetings. "Considerable discussions of this modernization program ensued; the directors concur in the opinion that the new equipment and improvements as described in said outline, are needed. * * *
"Ivan Racheff pointed out that a large portion of the Company's funds will be needed for working capital, especially in view of the high and rising cost of raw materials and equipment. Steel men are of the opinion that inventories are of necessity going to be larger than at present. To carry the same relative working units in an inventory today requires about twice as much money invested as was necessary just prior to the war. "Ivan Racheff also pointed out that during the recent past the Company's inventory amounted to around one half million dollars; so that now the amount should be two times as much in order to compare with those years. "Orville Johnson also showed that while now the Company's customers have ample money to buy steel, it may well be that, should a recession occur, the Knoxville Iron Company may have *202 to carry many of its old customers. It would require about twice as much dollar investment to carry the same customers now, buying the same number of units, as was necessary prior to 1941. Therefore, for this contingency the Company should be prepared. * * *
"The question of declaring dividends at this time was considered; a favorable opinion prevailed. Ivan Racheff stated that, in view of the need of practically all of the Company's available funds for carrying on the business, it would not be advisable to pay dividends in excess of $4.00 per share; but since the Company is able to pay such an amount, it should do so. "After a short discussion of this question, Ivan Racheff moved that $4.00 per share dividend be declared to stockholders of record December 29, 1947, payable January 5, 1948." * * *
Petitioner's board of directors recognized the necessity of rehabilitating the mill, and Racheff embarked upon a program of mechanization and modernization. He had many obstacles to overcome. He determined that petitioner would not have sufficient funds in 1948 to modernize the mill and conduct operations. He attempted to borrow money to finance the necessary modernization but failed. Complete *203 mechanization of the mill could not be accomplished without closing down operations for an extended period of time, but ceasing operations would have three undesirable effects on petitioner's business, one, revenue would be stopped, two, a large portion of the skilled labor would be lost, and three, customers would be lost. Racheff concluded that the mill's rehabilitation would have to be done on a piecemeal basis. During the years following World War II the steel industry was in the process of rebuilding and expanding. The demand for machinery used in the production and fabrication of steel was abnormally high and consequently the prices of heavy industrial machinery were abnormally high. At the same time there was a great scarcity of steel, which caused steel prices to rise. With market conditions as they were in the late 1940's, Racheff felt it would be wise to continue the mill at as high a level of production as could profitably be maintained until the demand for steel slackened. It was Racheff's plan to make only those repairs and improvements necessary to maintain production until a slackening of demand caused production to be cut back, at which time petitioner's labor force *204 could be utilized in the rehabilitation program. However, a series of events caused the delay of any major modernization activities. As the post World War II demand for steel began to ease, a steel strike in 1949, which did not affect petitioner's employees, caused steel to remain in short supply, and prolonged the demand for steel processed by petitioner. The Korean War started in 1950, and Racheff found that petitioner could continue to produce steel profitably because of its great demand and again delayed his plan for an extensive rehabilitation of the mill. On October 29, 1952, petitioner applied for a certificate of necessity from the Defense Production Administration to allow rapid amortization of proposed additions and alterations to the mill. It was estimated that the cost of expanding and remodeling the facilities would be $3,026.468. The rehabilitation program in the application was substantially the same as the program in the outline submitted to the board of directors in 1947, with the exception that while the program outlined in 1947 provided for the modernization of one rolling mill, the program in the application called for the complete modernization of petitioner's *205 rolling mill facilities. Petitioner's application was rejected. At the same time Racheff attempted to borrow money to finance his modernization program, but was unsuccessful. Favorable market conditions prevailed throughout the years in issue and enabled petitioner to continue operating profitably with its antiquated equipment. Only the most necessary repairs and improvements were made so as not to impede production, which continued at full capacity throughout the years in question with the exception of 1948. The cost of heavy industrial machinery remained high, and Racheff found it difficult to acquire machinery at what he felt was a reasonable price. A summary of petitioner's financial condition and operations for the years 1947 through 1953, follows: Tons of
Operating
Net Profit
Net Sales
Steel
Expenses
After Taxes
Dividends
1947
$2,123,126
23,803
$1,676,886
$289,071
$40,000
1948
3,007,422
25,139
2,103,931
592,049
40,000
1949
1,982,890
18,902
1,589,468
271,485
50,000
1950
1,898,434
19,321
1,572,930
206,969
50,000
1951
2,807,764
19,879
2,006,030
360,581
50,000
1952
2,629,214
23,088
2,220,938
210,120
50,000
1953
1,838,685
16,925
1,667,140
109,259
50,000
Current
Current
Reserve for
Assets
Liabilities
Depreciation
Surplus
1947
$1,098,611
$396,209
$1,259,721
$ 69,445
1948
1,855,250
590,109
1,286,379
621,495
1949
1,868,668
391,175
1,312,078
842,980
1950
2,013,557
376,505
1,336,208
1,000,545
1951
2,642,404
706,384
1,362,399
1,320,200
1952
2,593,593
574,849
1,391,486
1,501,826
1953
2,361,640
299,125
1,426,547
1,588,305
Petitioner *206 held the following amounts of cash and United States securities at the end of each of the years 1947 through 1953: Cash
Securities
1947
$ 712,817.23
0
1948
1,398,410.02
0
1949
1,581,893.07
0
1950
1,613,904.13
0
1951
740,753.57
$1,500,000
1952
677,634.44
1,500,000
1953
619,968.83
1,497,955
As of December 31 of any of the years in issue petitioner had a maximum of $250 of accounts receivable from employees and stockholders. Racheff had a salary of $36,000 per year during the period in issue. The following are excerpts from the minutes of meetings of petitioner's board of directors and stockholders during the years in issue: Board of Directors' Meeting, December 20, 1948: * * *
"Ivan Racheff, President, stated that the only reason for continued operation of the mills in spite of the great need for replacement of the Company's antiquated and worn out equipment, was the fact that the demand for steel has been, and continues to be, far in advance of ability to supply this demand. By most strenuous efforts, equipment was maintained in sufficient repair to operate. "It is this condition that explains why modernization of the entire plant has not yet actually been undertaken; however, steps have been taken to replace *207 certain most needed equipment. It should be pointed out that in an attempt to meet the great demand for steel, the Company has been operating its electric furnaces three shifts, seven days a week. "This policy of producing all possible tonnage without actual shut-down for renewal or replacement of equipment, has netted the Company a profit and given all its many employees steady employment. A shut-down under these conditions could not reasonably be contemplated even tho the planned modernization program had to be postponed. "It was pointed out that inventory requirements are now more than double what they were in pre-war years. "The Chair put the question as to how the Company would stand in case of a recession in business. "Ivan Racheff replied that in case of a recession and its concomitant sharpening of competition, it would be absolutely necessary for the Company to purchase new equipment in order to stay in business at all; money must be on hand for that eventuality, and much more than was necessary a year or two ago. "Ivan Racheff also pointed out that two of the most urgently needed equipments for replacement are the coal pulverizer and the water tanks. The Company made efforts *208 to get new equipment to replace these, but without success so far. Inability on part of the tank manufacturers to obtain steel plate (which is very scarce) had held up tank replacement; delay in delivery of engineering date and proposals by the pulverizer people held up that project. "He also stated that at this time a large working capital was not needed because the Company has been operating a great deal on a conversion basis; when that business is completed the Company will have to have a seizable working capital. Due to a most unusual demand for steel bars some customers were willing to provide the scarce raw material. "Ralph Brown asked if it was true that the Company had bought new equipment parts for straightening their rolled products (bars, angles, channels) but that it was unable to install this equipment due to customers' insistence on early deliveries. He understood that this equipment had lain idle, awaiting installation, for a year or more. "Ivan Racheff replied that that was true. * * *
"It having been pointed out that the minutes of the meeting held December 19, 1947, had appended to them an itemized list of equipment needed for modernization of the plant, the question *209 was raised as to what the cost of that program would be at the present time. "Ivan Racheff stated that the present cost of such a modernization program would probably come to several million dollars. "Ivan Racheff stated that real modernization would cost much more than would a mere replacement of this and that worn out equipment. If profits could be sufficient to raise the cash on hand to one half of the several million dollars needed, probbly the other half could be arranged for by a capital loan. A thorough study of the markets for our products in this region would have to precede such action. "Discussion of this matter brought up the question as to whether the Company would spend around $600,000.00 for rehabilitation, should full modernization not be contemplated. "Ivan Racheff stated that the Company could equip for fabrication of this or that product; but in order to modernize the mills, it would no doubt require several million dollars as stated. "Just to be able to operate competitively, the Company must have funds on hand for rehabilitation, which is far short of modernization. * * *
"The question of inventory was discussed. Ivan Racheff stated that the inventory is very low *210 at present. It must be built up but to do so to any large extent is taking a big risk for prices may drop suddenly. The high earnings shown for 1948 are due to cashing in on raw material which the Company has had on hand. "He further stated that at present the Company is paying $79.00 or $80.00 per ton for R.R. car axles. Since we sell our finished steel at $120.00 per ton, we have only $40.00/ton for conversion cost plus profit, the latter having dropped down to a few dollars per ton. However, at this price of $120.00/ton we are meeting considerable resistence, the stated reason being that this price is too high as compared to competitive prices. "I bring this out to show the great need for modernization or else engaging in other lines of business. If we had a modern mill, we could sell at 5" instead of at our present price of 6". Moreover, for every one man that the modern mills employ for given operation, we have to employ four. "In the discussion it was brought out that a highly competitive condition in the near future may be expected and that being the case, only those whose have modernized can survive. * * *
"Ralph Brown asked whether the Company's earnings justify the same [dividend's] *211 being paid as was declared last year. "Ivan Racheff replied that it did; the payment of a $4.00 dividend is in order. A higher rate would jeopardize the business activities of the Company. "Some discussion ensued regarding the amount of dividend that should be paid; it was the unanimous opinion of those present that the payment of more than $4.00 per share would encroach on the reserve funds ultimately needed for modernization, inventory expansion etc." * * *
Stockholders' Meeting, April 26, 1949: * * *
"The Company's surplus in relation to the 102 tax and the need of rehabilitation, if the Company was to stay in business, were discussed at length and it was agreed that a large surplus will be necessary to carry on. "It was further agreed that if the Company expends wisely such portion of its surplus for rehabilitation as is needed, and further, such amounts as are needed to restore the depleted inventories to normal status, then the immediate future of the Company is promising. Depletion of the surplus for any other purpose would be suicidal. * * *
Board of Directors' Meeting, December 15, 1949: * * *
"The first subject for discussion was the status of the Program of Rehabilitation or *212 Modernization entered upon and first recorded in the minutes of the meeting of Directors held December 19, 1947. "Ivan Racheff reported on trips taken to investigate several equipments which it might be advisable to install. * * *
"Discussion was opened on surplus; since not enough surplus is available for all contingencies, the discussion centered on whether to apply it on (1) rehabilitation program, (2) increasing the Company's inventories at an advantageous price or (3) on entering on some new but related line of business, such for example as fabricating some of the steel bars we produce. * * * "Hungelmann: As far back as 1947 the [Rehabilitation] Program was planned. The delays we've met since then could hardly have been anticipated. For quite some time we expected to get back to normalcy; however, we got a surprise in that the high demand for steel continued. "Ivan Racheff: Yes, it was because of that that we were able to continue operations at a profit even with our antiquated equipment; it took very great efforts to keep it running. But we couldn't think of shutting down for modernization in face of the urgent demands for our products. "Late in 1948 we thought surely that early *213 in 1949 we could enter actively on rehabilitation. We were still converting for some of our customers thruout 1949. At present we do not expect a continued high demand, exceeding capacity to produce. Recently we've had to operate at all costs to satisfy customers who came to us with orders above and beyond the normal demand, no doubt in part due to the strike situation. "We can probably continue to spring or early summer of 1950; thereafter we can probably begin a rehabilitation program, thus preparing for a setback in business. "Up to now we've spent approximately $25,000.00 for new equipment. A clean-up campaign was necessary before entering on rehabilitation proper; this too, was expensive and took time, for we had to get rid of all the old inventory of billets and miscellaneous scrap, since the latter tended to contaminate any steel made; even at the present time there is a pile of such inferior scrap on hand. No intelligent program of improvement and modernization can well be entered on until all such material is disposed of. "For quite some time now I've been in touch with engineers to get an estimate of the cost of revamping the entire mill. A more modern mill set-up consisting *214 of either one mill to handle all sections we now roll or else two mills, one being designed to roll the smaller sections and one to take care of the larger sections. Altho we would be in position to spend approximately $300,000.00 or even more on such a project, we could not spend three million dollars, the cost of a modern mill for all sections. Any expenditure over about a quarter of a million dollars would definitely jeopardize our ability to provide the needed inventories. * * *
"Ivan Racheff: The dividend should not exceed $5.00 per share, or a total of $50,000.00; this is for the best interest of all concerned. We should modernize rather than deplete our funds by a high dividend; thus we will be in position to consider modernization, so badly needed." * * *
Board of Directors' Meeting, December 19, 1950: * * *
"Ivan Racheff: The first subject for discussion is the progress toward rehabilitation effected during the past year. [Discussion followed] * * *
"A. Hungelmann: In view of the expenditures already made along the line of Rehabilitation Program and such as will be necessary in the very near future, I move that the Company pay a Dividend of $5.00 per share, to be paid on January *215 5, 1951, to stockholders of record December 31, 1950. "This motion was seconded and carried; payment of a $5.00 dividend was ordered." * * *
Board of Directors' Meeting, December 17, 1951: "Ivan Racheff, Chairman, stated the first subject for discussion is the present status of Rehabilitation. [Discussion followed] * * *
"The money available for Rehabilitation purposes is quite limited and therefore must be spent in whatever field it contributes most, not only to the Company's own continued operation, but also to the increasing needs of the re-armament program. "Ralph W. Brown moved that the Company rely on Ivan Racheff's judgment regarding the purchases best suited to promote continued sound and enlarged activities, both as to what purchases to make and when best to install such equipment. The motion was seconded and carried." * * *
Board of Directors' Meeting, December 17, 1952: * * *
"It was pointed out that on account of the Korean war and post World War II conditions prevailing prior thereto, there are acute shortages and very high prices prevailing in all lines and not only that but a strong and firm market at profitable prices prevails for the tonnage the company is able to produce *216 with its existing equipment and installation of new equipment of any substantial volume would involve a shutdown of the plant or partial suspension for an indefinite length of time, and that a shutdown, or suspension, would release the skilled working personnel and they would scatter to other jobs. There is a shortage of skilled workers and training of such workers requires many years. It was agreed that it was the duty of every producer to continue operations so long as profitable in the interests of the national economy and safety. "The President said that the Commissioner of Internal Revenue has served notice on the company on September 19, 1949 that for the year 1947 he was assessing the company for Federal 102 surtaxes in the amount of $84,892.52 on which interest has accrued at the rate of six percent per year and through 1952 interest has accrued in the approximate amount of $25,467.76, total interest and tax $110,360.28; [Discussion of sec. 102 assessments for 1948 and 1949 followed.] * * *
"The President stated that he had received legal advice that the company is not liable for 102 surtax and that it could not be collected but that he had also received legal advice that the *217 action of the Commissioner in levying 102 surtaxes for the years 1947, 1948 and 1949 constituted a warning to the company that a like tax will be assessed against any future earnings of the company and until the question is decided by the Courts, the could of these present assessments with interest, and future assessments with interest, will be hanging over the company and he has already ascertained that it will be impossible to obtain credit from any bank or any other institution so long as the could of this proposed 102 surtax assessment is present. Notwithstanding the 102 surtax cloud, the President announced that he would continue his program of a gradual acquisition of such items of machinery and equipment as were available at a reasonable cost and that could be installed without shutdown of the plant and that during the year 1952 new equipment had been acquired at a cost of approximately $82,000.00." * * *
Board of Directors' Meeting, December 19, 1953: * * *
"(9) While the outlook was depressing the production lag would admit of the operation of the plant to the extent necessary to fill existing orders and with a time element that made it possible to shut down the plant without *218 shutting off needed production during which time any work necessary in the way of rehabilitation, modernization or mechanization, could be performed and active operations resumed so as to have no delay in filling current orders. As previously pointed out additions to plant and equipment for the year 1952 involved an outlay of $82,973.52, and it now appears that for the year 1953 we have been able to make other additions to plant account involving approximately $50,000.00. "(10) Notwithstanding the close of the Korean war and the softening of the market for the company's product the World War II and Korean war postwar activity was still operating to produce a scarcity of machinery, equipment and building materials and that very high price levels continued to prevail and that the company still faced a problem in its rehabilitation, modernization and mechanization efforts as a result of the continued scarcities and abnormal market prices which would necessitate extreme caution and further effort to acquire at second hand value so far as possible the material necessary to provide modernization and mechanization. * * *
"(12) In the execution of the company's plans for rehabilitation, modernization *219 and mechanization, this total 102 surtax assessment and interest of $647,138.06 must be reckoned with as, if sustained, the amount claimed will be a first and prior lien on the property of the company and it will be readily apparent that with this very substantial obligation resting against the company as a potential liability presents a substantial obstacle as to bank credit in the performance of any plan." * * *
During the years 1947 through 1953 petitioner made the following amounts of capital expenditures and repairs as shown in revenue agents' report and/or petitioner's records: Capital
Expenditures
Repairs
1947
$ 5,968.00
$ 60,686.97
1948
17,821.43
96,783.64
1949
32,078.30
60,374.68
1950
25,957.18
61,353.38
1951
46,785.87
67,556.05
1952
127,079.98
70,545.26
1953
82,608.58
41,135.14
Totals
$338,299.34
$458,435.12
Had petitioner paid Racheff his proportionate share of the undistributed earnings and profits during each of the years in issue, Racheff would have had to pay additional Federal income tax in estimated amounts as follows: Additional Tax
1948
$370,000.00
1949
147,878.64
1950
107,699.00
1951
241,131.00
1952
135,346.44
1953
63,000.00
In August 1956 Louis Trachsel was employed as an engineer by petitioner to assist *220 Racheff with his modernization plan. Trachsel made a survey of the mill and made a schedule of the improvements he felt would be necessary "to place the Knoxville Iron Company in a very favorable competitive position with the mills, of the type known as Merchant Mills, of similar capacity which can serve this area." His schedule called for expenditures totaling $3,653,820 and was approved by Racheff. As of the time of trial improvements totaling approximately $175,000 were under construction, pursuant to Trachsel's modernization program. The following is a summary of petitioner's net sales, net profit after taxes, dividends paid, and capital expenditures for the years 1954 through 1957: Net Profit
Dividends
Capital
Net Sales
After Taxes
Paid
Expenditures
1954
$1,372.000
$ 64,005
$ 50,000
$ 38,311.44
1955
2,158.735
23,393
50,000
36,246.50
1956
2,459.082
116,609
50,000
52,107.42
1957 (est.)
1,793,405
74,200
50,000
58,005.31
Totals
$278,207
$200,000
$184,670.67
Petitioner was not availed of during any of the years in issue for the purpose of preventing the imposition of surtax upon its shareholders by permitting its earnings and profits to accumulate instead of being distributed. A debt in the amount of $7,189.06 was *221 owed petitioner by Lewis & McDowell. In 1953 a suit was pending for the collection of the debt. Petitioner included the $7,189.06 in a claimed bad debt deduction in 1953. In 1954 $4,000 of the debt was collected. Respondent disallowed petitioner's deduction. Respondent capitalized numerous expenditures which petitioner treated as repairs or other operating expenses during 1950 through 1953. Petitioner contests respondent's treatment of the following expenditures: Item 1
4-24-50
John Beretta Tile Co.
$ 200.75
Item 2
12-30-50
Sentell Brothers
220.00
Item 3
3-10-50 & 11- 3-50
Tidewater Supply Co.
270.49
Item 4
2-24-50 to 9-11-51
Tennessee Concrete & Supply Co.
including labor of $600
3,763.86
Item 5
9- 4-52 & 10-29-52
Buford & Tucker Steel Co.
675.12
Item 6
12- 1-52
Broadway Metal & Roofing Co.
466.00
Item 7
1-25-52 to 3-12-52
Chavannes Lumber Co.
710.52
Item 8
7-31-52 to 12-30-52
Witt Lumber Co.
3,887.65
Item 9
12- 2-52 & 12-16-52
Knoxville Foundry Co.
4,934.69
Item 10
1- 7-52 to 10-30-52
Tennessee Concrete & Supply Co.
Knox Sangravel Co.
Ready Mixed Concrete Co.
including reinforcing steel
8,865.01
Item 11
6-13-52 to 12- 8-52
Allis Chalmers Mfg. Co.
6,201.18
Item 12
11-30-52
Knoxville Construction Co.
500.00
Item 13
10-31-52 to 12-17-52
Lon Mills
Faulkner Mtn. View Nursery
1,350.66
Item 14
1-27-53 to 8-11-53
Bell Plumbing & Heating Co.
203.85
Item 15
8-28-53 & 11-30-53
Construction Service Co.
505.90
Item 16
3-18-53 to 4-17-53
Knoxville Foundry Co.
4,192.15
Item 17
10-22-53
Lansdale Lumber Co.
132.60
Item 18
1-31-53
Allis Chalmers Mfg. Co.
603.19
Item 19
4- 6-53 to 11- 1-53
Knox Sangravel Co.
1,270.67
*222 The facts and circumstances surrounding the questioned expenditures are as follows: Item 1: Expenditures for the purchase and installation of rubber flooring in a reception room of the main office. The rubber flooring covered over an old hardwood floor which was badly worn and could no longer be refinished. This item was a capital expenditure. Item 2: Expenditure for replastering ceilings and walls of some of the offices in the mill. The walls had become cracked due to leaking and in some places the plaster had fallen off. This item was a capital expenditure. Item 3: Expenditures for the purchase and installation of new rest room facilities. The old facilities had broken in a heavy freeze. This item was a capital expenditure. Items 4, 10 & 19: Expenditures for replacing or resurfacing concrete floors throughout the mill. The floors were cracked through use, were not level, and in some places had been broken for the installation of new machinery and pipes. These items were capital expenditures. Item 5: Expenditures for corrugated roofing sheets used to replace sheets which had blown off or were otherwise damaged. This item was a repair. Item 6: Expenditure for repairs to the guttering *223 on the main office building. The guttering had been damaged by a heavy snow storm. This item was a repair. Item 7: Expenditures for lumber, the use of which is not shown. Item 8: Expenditures for lumber and building materials the use of which is not shown. Items 9 & 16: Expenditures for cast iron floor plates used around the rolling mills. The plates were fragile and frequently broke when heavy objects fell on them. The plates purchased were used to replace plates which had broken through use. These items were repairs. Item 11: Expenditures for replacement of coils and a tap changer in the transformers used to pull the mill's electric furnaces. The parts had a useful life of approximately three years. The replacement cost of the transformers is approximately $30,000. This item was a repair. Item 12: Expenditure for patching an asphalt driveway which had become broken due to heavy loads passing over it. The driveway had been similarly patched and repaired in 1950. This item was a repair. Item 13: Expenditures for grading, seeding and shrubbing an area behind the mill, in order to convert it into a park. This item was a capital expenditure. Item 14: Expenditures for a purpose not shown. *224 Item 15: Expenditures for the replacement or repair of broken slate roofing on the main office building. Many pieces of slate had become loose and fallen off the roof. The entire slate roof was tightened and leaks stopped. This item was a repair. Item 17: Expenditures for the purchase of a small amount of flooring used in one of petitioner's nine tenant houses. This item was a repair. Item 18: Petitioner purchased some equipment from Allis Chalmers Manufacturing Co. and employed the services of two Allis Chalmers men to train personnel to operate the equipment. This expenditure was for the services of the Allis Chalmers men. This item was an ordinary and necessary business expense deductible in 1953. Between December 1950 and November 1953, petitioner replaced or resurfaced the concrete floors in the mill. It deducted the expense of replacing and resurfacing the floor as repairs. Respondent determined the expenditures to be capital improvements, and in lieu of allowing deductions of the expenditures as repairs, allowed depreciation deductions. Respondent determined the concrete floor to have a 20-year life. Opinion The first issue is whether petitioner was availed of for the purpose *225 of avoiding the imposition of surtax upon its shareholders during the years 1948 through 1953. Section 102, Internal Revenue Code of 1939, provides for the imposition of a surtax on a corporation availed of for the purpose of preventing the imposition of surtax upon its shareholders. It further provides, so far as here pertinent, that the fact that earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of its business shall be determinative of the purpose to avoid surtax upon its shareholders unless the corporation by a clear preponderance of the evidence shall prove to the contrary. The ascertainment of the "reasonable needs" of a corporation is in the first instance a task for the officers and directors of the corporation, and the Court should be hesitant to attribute an ulterior motive to the corporation, its officers and directors, unless clearly warranted by the facts and circumstances surrounding the questioned accumulation of earnings and profits. Crawford County Printing & Publishing Co., 17 T.C. 1404. At the same time the Court is not required to accept as conclusive mere statements by a corporation's officers and directors that the *226 questioned accumulation was not for the purpose interdicted by the statute. Helvering v. National Grocery Co., 340 U.S. 282 (1938). We shall not enumerate and analyze the numerous cases involving this issue for it is basically a fact question, and each case rests upon its own peculiar facts and circumstances. Olin Corporation v. Commissioner, 128 Fed. (2d) 185, affirming 42 B.T.A. 1203; World Publishing Co. v. United States, 169 Fed. (2d) 186. The initial dispute between the parties involves the question of who had the burden of proof as a result of petitioner, pursuant to section 534(c), submitting a timely statement of grounds on which it relies to establish that there was no accumulation beyond the reasonable needs of its business. We see no reason to tarry with this question, for the facts and circumstances surrounding the accumulation of earnings and profits in the instant case clearly dictate the conclusion we must reach on the ultimate issue, regardless of which party had the burden of proof. Suffice it to say that as to the ultimate issue, that is whether the corporation was availed of for the purpose of avoiding the imposition of surtax upon its shareholders, the burden *227 of proof is on petitioner. Pelton Steel Casting Co., 28 T.C. 153, affd. on other grounds 251 Fed. (2d) 278. One of petitioner's arguments is that it cannot be subject to a surtax under section 102 until its surplus exceeds its reserve for depreciation plus its working capital. The authorities cited by petitioner, however, do not go so far. Unquestionably reserves for depreciation are to be considered but they are not conclusive in determining whether an accumulation is reasonable. The question in each case is the intent behind the accumulation. KOMA, Inc. v. Commissioner, 189 Fed. (2d) 390, affirming a Memorandum Opinion of this Court [8 TCM 1064]. Petitioner contends that the purpose of its accumulation of earnings and profits was to provide funds to be utilized in the rehabilitation of its antiquated mill. It argues that there was no accumulation of earnings and profits beyond the amounts required for its day to day operations and its rehabilitation program. Respondent does not dispute the fact that petitioner's mill was badly in need of modernization. Respondent does contend, however, that there was no need for the questioned accumulation, for, he argues, petitioner's officers *228 and directors had no intention of spending any substantial amounts of money to rehabilitate the mill. He argues that there was no plan for an extensive rehabilitation of the mill, or that if there was a plan, the accumulation was far in excess of the contemplated improvements. He illustrates his argument with the fact that while petitioner earned about $1,800,000 after taxes during the period in issue, it expended only about $330,000 for capital improvements and $290,000 as dividends. He also points out that had petitioner's entire earnings and profits been distributed, Racheff would have had to pay an additional tax of approximately $1,065,055.08. He concludes that since any improvements contemplated by petitioner were to have been made over a period of years, the improvements could have been made out of current income, and that the primary reason for the accumulation was to avoid the imposition of surtax upon Racheff. We cannot agree with respondent's position. The nub of the problem is whether the questioned accumulation was made with the intention of utilizing it solely for the maintenance of operations and rehabilitation of the mill, or for the purpose prohibited by section 102. *229 There is no doubt that a corporation's earnings and profits may be accumulated for the purpose of expansion and modernization of its facilities without an assessment under section 102. Breitfeller Sales, Inc., 28 T.C. 1164; Crawford County Printing & Publishing Co., supra.Such was the purpose of the accumulation in the instant case. When Racheff became acting general manager of petitioner's mill in 1945, petitioner was in grave financial difficulty. Racheff, with his many years' experience in the steel field, realized the shortcomings of petitioner's antiquated mill and at the end of 1947, when he gained control of petitioner, embarked upon a program of modernization and rehabilitation in order that petitioner might successfully compete when market conditions returned to normal. Unforeseen events and unusual business conditions forced the delay of most of the contemplated improvements. These events and conditions are enumerated in the Findings of Fact. The minutes of the stockholders' and directors' meetings clearly indicate the events which caused the delays in the modernization program. There is no evidence that petitioner's officers and directors abandoned the rehabilitation *230 program which started in 1947. Indeed the evidence is quite to the contrary. During the period in issue over $330,000 of improvements and over $400,000 of repairs were made. At the same time $290,000 was paid out in dividends. Only the most necessary improvements were made in order not to impede steel production, but the rehabilitation program was never abandoned, only delayed, as evidenced by petitioner's application in 1952 for a certificate of necessity to allow rapid amortization of contemplated alterations and additions to the mill. It should be noted that the rehabilitation program in petitioner's certificate of necessity was substantially the same program as that in the outline submitted at the board of directors' meeting in 1947, with the exception of a more extensive mechanization of the rolling mills. Petitioner was forced to continue accumulating most of its earnings and profits because of its history of widely fluctuating income. It could not depend upon future profits being sufficient to cover rising operational costs and the contemplated capital expenditures. There is no evidence of substantial "loans" to officers, directors or stockholders or of investments unrelated *231 to petitioner's business except that the accumulated funds were held in readily liquidable United States securities. Cf. KOMA, Inc. v. Commissioner, supra. We are convinced and the uncontroverted expert testimony is in agreement, that Racheff's decisions to delay extensive improvements in order to take advantage of the unusual steel market then prevailing, and to accumulate petitioner's earnings and profits for use in modernization of the mill when the demand for steel slackened, were sound business conclusions. There was no accumulation of earnings and profits beyond the amounts required for petitioner's operations and contemplated expenditures. In our opinion the entire record is devoid of any indication that the questioned accumulation was for any purpose other than that contended by petitioner. The evidence conclusively establishes that petitioner was not availed of for the purpose of avoiding the imposition of surtax upon its shareholders. Accordingly, we hold for petitioner on this issue. The second issue is whether petitioner was entitled to a bad debt deduction in 1953. Petitioner contends that since only $4,000 of the $7,189.06 debt owed by Lewis & McDowell was recovered, *232 it was entitled to a bad debt deduction in 1953 in the amount of $3,189.06. Section 23(k)(1) provides, so far as here pertinent, as follows: "SEC. 23. DEDUCTIONS FROM GROSS INCOME. "In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - "(1) General Rule. - Debts which become worthless within the taxable year; * * * and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *" Petitioner has the burden of proving that it was entitled to a deduction for a bad debt in the year claimed, and the amount thereof. H. W. Findley, 25 T.C. 311, affd. 236 Fed. (2d) 959. When petitioner wrote off the Lewis & McDowell debt in 1953, it had a law suit pending for the collection of the debt, and in 1954 recovered $4,000. This is all the evidence before the Court on this issue. The evidence before the Court fails to shed any light on the degree of worthlessness, if any, of the Lewis & McDowell debt in 1953. Respondent's determination is sustained. The third issue is whether certain expenditures made by petitioner during the years in *233 issue were in the nature of repairs or capital expenditures. The issue is basically a question of fact, and the burden of proof is on the petitioner. Section 23(a)(1)(A), Internal Revenue Code of 1939, allows the deduction of "All ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, * * *." Regs. 111, section 29.23(a)-4, * provide, so far as here pertinent, that "The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as expense, * * *." The distinction between repairs and capital expenditures is clearly outlined in Illinois Merchants Trust Co., Executor, 4 B.T.A. 103. "* * * In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily *234 efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * *" After considering all of the evidence before us, we have found as a fact that items 1, 2, 3, 4, 10, 13, and 19 were capital expenditures, and that items 5, 6, 9, 11, 12, 15, 16, and 17 were repairs deductible within section 23(a)(1)(A). On items 7, 8, and 14, petitioner has failed to present a sufficient amount of conclusive evidence upon which to base a decision, and respondent's determination in respect to these items is sustained. In respect to item 18, the expenditure for the services of two Allis Chalmers men for training personnel to operate new equipment purchased from Allis Chalmers, *235 is clearly an "ordinary and necessary" expense deductible in 1953. Other expenditures capitalized by respondent have not been discussed due to having been conceded or not properly placed in issue by petitioner. Only issues raised by pleadings may be considered by this Court. The final issue is whether respondent properly determined the rate of depreciation for the concrete floor installed in the mill during the years 1950 through 1953. Petitioner has failed to present any conclusive evidence on this issue. Since the burden of proof was on petitioner, respondent's determination is sustained. The amount of any excess profits credit carry-back or carry-forward to which petitioner may be entitled for the years involved, considering the adjustments hereinabove determined, will be computed under Rule 50. **
Footnotes
*. Regs. 118, Section 39.23(a)-4, has an identical provision.↩
**. Previous paragraph was deleted and the above new paragraph was added by an official order of the Tax Court, dated April 3, 1959 and signed by Judge Bruce.↩